**NATIONAL MINING ASSOCIATION, Petitioner,**

v.

**MINE SAFETY AND HEALTH ADMINISTRATION and Secretary of Labor, Respondents,**

**United Mine Workers of America, International Union, Intervenor.**

**Nos. 92–1288 to 92–1290, 96–1150 and 96–1155.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 1997.

Decided June 17, 1997.

522

Henry Chajet, argued the cause, for petitioner National Mining Association, with whom Harold P. Quinn, Jr. and Michael F. Duffy, Washington, DC, were on the briefs.

Judith Rivlin, Washington, DC, argued the cause, for petitioner United Mine Workers of America, International Union, with whom Grant Crandall was on the briefs. Mary L. Jordan and Robert H. Stropp, Jr., entered appearances.

Jerald S. Feingold, Attorney, Arlington, VA, United States Department of Labor, argued the cause, for respondents, with whom J. Davitt McAteer, Acting Solicitor, Mount Hope, WV, W. Christian Schumann, Counsel, Washington, DC, and Edward J. Sexauer, Attorney, were on the brief.

Before SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed PER CURIAM.[1]

PER CURIAM:

These consolidated cases seek review of a rulemaking of the Mine Safety and Health Administration ("MSHA"). Representatives of both the industry and the miners challenge the rulemaking on a number of grounds, only some of which merit discussion. We hold that the agency failed to give adequate notice of its intention to require preshift examinations at fixed-time intervals as opposed to on a shift-by-shift basis. As to all other issues we deny the petitions for review and uphold the agency's rulemaking.

## I. Background

This case first arose as a challenge to a set of safety rules proposed by MSHA in 1988, 53 Fed.Reg. 2382 (1988), and finalized in 1992, 57 Fed.Reg. 20,868 (1992). The rulemaking was intended to "upgrade existing provisions consistent with advances in technology, eliminate unnecessary reporting and recordkeeping requirements, minimize conflicting provisions, delete irrelevant standards, simplify and consolidate existing standards, address known hazards not now covered by standards, and clarify and reorganize standards, where necessary." 53 Fed.Reg. 2382. Predecessor organizations of the National Mining Association ("NMA"), representing the industry, and the United Mine Workers of America, International Union ("UMWA" or the "Union"), representing the miners, challenged the 1992 rule in this Court. The Court stayed the effect of one provision, 30 C.F.R. § 75.321(a), which regulates air quality standards in bleeder entries. *American Mining Congress v. Secretary of Labor,* No.92–1288 (D.C.Cir. Nov. 10, 1992) (order). MSHA voluntarily stayed the effect of two additional provisions, 30 C.F.R. § 75.313, relating to fan stoppages, and 30 C.F.R. § 75.344(a)(1), regulating compressors. 57 Fed.Reg. 53,856 (1992). The remaining sections of the rule became effective on November 16, 1992. *See* 57 Fed.Reg. 34,683 (1992).

MSHA then agreed to further review the 1992 rule and to propose revisions. With the consent of the parties the Court then stayed the petitions pending the agency's review. *American Mining Congress v. Secretary of Labor,* No.92–1288 (D.C.Cir. Aug. 17, 1993) (order); *American Mining Congress v. Secretary of Labor,* No. 92–1288 (D.C.Cir. Oct.6, 1994) (order). In 1994, the agency published a proposed rule that adopted revisions to the 1992 version. 59 Fed.Reg. 26356. The agency published a final rule in 1996. 61 Fed. Reg. 9764. NMA and UMWA petitioned this Court for review in cases that were consolidated with the earlier challenges. The Court stayed the effect of two provisions, 30 C.F.R. §§ 75.313(d)(2) and 75.321(a)(2). *National Mining Assoc. v. MSHA,* No. 96–1150 (D.C.Cir. June 7, 1996) (orders). The remainder of the rule became effective in June, 1996.

## II. NMA's Challenges

A. *30 C.F.R. § 75.321(a)(2)—Air Quality Standards in Bleeder Entries*

■ NMA challenges, on a number of grounds, the requirement that the oxygen

---

1. Judge Sentelle authored Parts I., II.A–C, III.B, and O. Judge Randolph authored Parts II.D–F and III.A. Judge Rogers authored Part III.C–N.

level in bleeder entries remain at or above 19.5 percent. 30 C.F.R. § 75.321(a)(2). NMA asserts, first, that the requirement violates the Federal Mine Safety and Health Act ("Mine Act" or the "Act"), 30 U.S.C. §§ 801–962. The Mine Act requires an oxygen level of 19.5 percent in the "active workings" of the mine. 30 U.S.C. § 863(b). An "active working[ ]" is defined as "any place in a coal mine where miners are normally required to work or travel." 30 U.S.C. § 878(g)(4). A bleeder entry, which is a ventilation device used to move methane and other gases away from areas where miners work, is entered at least once a week for inspection. *See* 30 C.F.R. § 75.364(a). A number of administrative law judges have held that a bleeder entry is not part of the mine's active workings. *See, e.g., Rochester & Pittsburgh Coal Company,* 11 FMSHRC 1318, 1321 (1989); *Rushton Mining Company,* 11 FMSHRC 1506, 1507 (1989). *See also* 30 U.S.C. § 863(z)(2) (stating that bleeder systems should be maintained "to protect the active workings of the mine"); 30 C.F.R. § 75.334(b)(1) (describing bleeder systems as ventilation devices used to move methane and other gases "away from active workings."). NMA asserts that Congress's decision to provide the 19.5 percent standard only for active workings mandates a lower standard for other areas, such as the bleeder systems. The agency interprets the Act to allow for oxygen standards in any area of the mine where miners require adequate oxygen supplies.

Under the familiar rules of *Chevron* deference, we find nothing in the Mine Act that prohibits the regulation at issue. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* a court first asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If so, the matter is settled, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the

statute," *id.* at 843, 104 S.Ct. at 2781 meaning one that is "reasonable and consistent with the statute's purpose." *Nuclear Information Resource Service v. NRC,* 969 F.2d 1169, 1173 (D.C.Cir.1992).

We cannot say, under the first step of *Chevron,* that the Mine Act unambiguously prohibits the agency from applying the 19.5 percent oxygen requirement to bleeder entries. NMA's interpretation of the Act employs a version of *expressio unius est exclusio alterius;* because Congress explicitly mandated safety standards in some areas of the mine, the agency is prohibited from adopting regulations not specifically provided for in the statute. We do not believe that NMA's reading "give[s] effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Quite to the contrary, we find it to be implausible. Congress frequently adopts specific safety standards and at the same time delegates the task of supplementing the standards to agency expertise. The Mine Act specifically provides that the standards specified by Congress are not exhaustive. Section 101(a) of the Act authorizes the Secretary to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). To interpret the safety standards provided by the Act as necessarily exclusive of more extensive protections is to annul the agency's authority under Section 101(a).

Turning then to *Chevron* Step Two, we cannot conclude that the agency's interpretation of the Act is unreasonable. The agency has "promulgate[d] . . . improved mandatory health or safety standards for the protection of life and prevention of injuries" as authorized by Section 101(a). In doing so, the agency has borrowed a standard endorsed by Congress elsewhere in the Act. *See* 30 U.S.C. § 863(b). The agency's interpretation appears eminently "reasonable and consistent with the statute's purpose." *Nuclear Information,* 969 F.2d at 1173. We therefore reject NMA's statutory challenge.

NMA also asserts that 30 C.F.R. § 75.321(a)(2) is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §§ 553, 706, because the agency failed to identify its reasons for requiring an oxygen level of 19.5 percent as opposed to the 18 percent oxygen standard favored by the industry. When regulating under Section 101(a) the agency is required, as always, to consider the relevant alternatives and identify the reasons for its preference. *See Motor Vehicle Mfrs. Assoc. v. State Farm*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983). As part of its explanation, the agency must "respond to specific challenges that are sufficiently central to its decision." *International Fabricare Institute v. EPA*, 972 F.2d 384, 389 (D.C.Cir.1992). Several industry commenters voiced support for an 18 percent oxygen level, often citing to a recommendation by the American Conference of Governmental Industrial Hygienists ("ACGIH"). *See, e.g.*, Comments of AMC, BCOA, and NCA; Comments of Kerr–McGee Coal Corp. The agency specifically acknowledged these comments and defended its choice by noting that bleeder entries are examined weekly by a person traveling alone who often is required to remain in the bleeder entry for an extended period. The agency cited a study by the National Institute for Occupational Safety and Health ("NIOSH") that recommends a 19.5 percent oxygen level for most tasks. NIOSH noted that this level includes a margin of safety. The margin is vital, according to NIOSH, because "oxygen-deficient atmospheres offer little warning of the danger." MSHA then offered two examples of mining accidents caused by inadequate oxygen supplies. The agency concluded:

> Because mine examiners are required to work or travel in areas where oxygen-deficient air could occur without warning, and they normally travel and work alone, there must be a requirement that provides them the protection necessary for the performance of their duties under these conditions. It is important that the level for oxygen be established above that identified as resulting in impaired judgement because it is essential that individuals traveling in these areas remain highly alert.

The hazards that can exist in bleeder entries and worked-out areas include elevated methane levels, poor footing, loose and unstable roof, and water accumulations. For this reason, the final rule adopts a minimum level of oxygen of 19.5 percent as recommended by NIOSH.

61 Fed.Reg. 9777.

Given this extended discussion, we cannot say that the agency failed to respond to specific challenges or to justify the rule with sufficient clarity. At the same time we reject NMA's contention that the agency was required to demonstrate that an oxygen standard of 18 percent would have posed a significant risk to miners. The 19.5 percent standard is permissible even without a significant risk that miners would be endangered by oxygen levels of 18 percent. In *Industrial Union Department, AFL–CIO v. Amer. Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), the Supreme Court considered a provision of OSHA that authorizes the Secretary to promulgate standards that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). The Court interpreted the provision to require the agency "to make a threshold finding that … significant risks are present and can be eliminated or lessened by a change in practices." *Industrial Union*, 448 U.S. at 642, 100 S.Ct. at 2863. We note, first, that this case arises under a differently worded statute. Section 101(a) states only that the Secretary is authorized to "develop, promulgate, and revise as may be *appropriate*, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a) (emphasis added). Arguably, *this* language does not mandate the same risk-finding requirement as OSHA.

Even if we were to hold that MSHA was compelled by the statute to identify a significant risk posed by the existing standard, it has done so here. Contrary to the assertions of NMA's counsel at oral argument, the regulations in effect prior to this rulemaking did not impose an 18 percent oxygen requirement; they were silent on the question of air

quality in bleeder entries.[2] At most, therefore, the agency was required to identify a significant risk associated with having no oxygen standard at all. As noted, the agency has identified a number of significant risks associated with inadequate oxygen supplies including "impairment in the ability to think and pay attention, and a reduction in coordination" as well as "adverse physiological effects." 61 Fed.Reg. 9776. The agency pointed to an instance in which a miner was asphyxiated working in an area with inadequate oxygen supplies, and another instance in which an examiner lost consciousness. *Id.* The determination that 19.5 percent is appropriate, as opposed to a marginally lower standard, is a technical decision entrusted to the expertise of the agency rather than the conjecture of the Court. In any case, as NMA conceded at oral argument, the Secretary was entitled to " 'err' on the side of overprotection by setting a fully adequate margin of safety." *American Petroleum Institute v. Costle*, 665 F.2d 1176, 1186 (D.C.Cir.), *cert. denied*, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982).

Finally, NMA claims that the 19.5 percent standard may, in fact, increase the danger to miners by requiring hazardous changes to ventilation systems. In support, NMA relies on declarations by industry experts. We have granted the Secretary's Motion to Strike these declarations as they are not properly part of the record. *See AT&T Information Systems, Inc. v. General Services Administration*, 810 F.2d 1233, 1236 (D.C.Cir.1987). Therefore, NMA's assertions on this point are rejected as speculative.

B. *30 C.F.R. § 75.323—Allegedly conflicting requirements*

■ 30 C.F.R. § 75.323 requires a mine operator to take remedial action "at once" when methane levels in a working place or an intake air course reach 1.0 percent. NMA claims that the requirement that changes be made "at once" is irreconcilable with 30 C.F.R. § 75.370(d) which states that "[a]ny intentional change to the ventilation system ... that could materially affect the safety and health of the miners ... shall be submitted to and approved by the district manager before implementation." NMA asserts that a change cannot be made "at once" under Section 75.323 if prior approval is necessary under Section 75.370(d). In response to comments on this point the agency stated,

> MSHA knows of no case where an operator has been prohibited from [making] a necessary correction for a methane problem pending a plan approval. However, in cases where intentional changes are made which could materially affect the safety and health of miners, approval is required *before resumption of normal work* if the changes affect the information approved in the mine ventilation plan. MSHA recognizes that some ventilation changes take time to accomplish and interprets the phrase "at once" as meaning that the work of making the necessary change to reduce methane levels begins immediately.

61 Fed.Reg. 9777 (emphasis added). The agency's interpretation of its own regulations is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation." *Jersey Shore Broadcasting Corp. v. FCC*, 37 F.3d 1531, 1536 (D.C.Cir.1994). Therefore, Section 75.323 requires only that the operator immediately begin taking the necessary steps to reduce methane levels. When approval is required for a ventilation change under Section 75.370(d) the operator is required only to begin to make the necessary correction "at once" and to obtain approval before the resumption of normal work.

NMA also asserts a conflict between Section 75.323 and 30 C.F.R. § 75.324 which requires that a "person designated by the operator shall supervise any intentional change in ventilation." Section 75.324 also states that when an intentional change in the

---

2. Citing 30 C.F.R. § 75.322, NMA asserts that the existing air quality standard prior to adoption of the challenged rule required an oxygen level of 18 percent. Section 75.322 states only that "[c]oncentrations of noxious or poisonous gases, other than carbon dioxide, shall not exceed the current threshold limit values (TLV) as specified and applied by the [ACGIH]...." ACGIH recommends a minimum oxygen content of 18 percent, but oxygen is not, so far as we can tell, a noxious or poisonous gas.

ventilation system is made "[e]lectric power shall be removed from areas affected by the ventilation change and mechanized equipment in those areas shall be shut off." NMA does not identify what conflict it perceives in the provisions, and we are unable to identify any inconsistency. Section 75.324 could require a mine operator to depower a mine before beginning ventilation changes, however, as authoritatively interpreted, Section 75.323 requires only that the act of depowering begin "at once," not that the repairs be completed immediately. 61 Fed.Reg. 9777. When Section 75.324 requires the operator to depower the plant, immediate depowering followed by the ventilation changes satisfies the requirements of Section 75.323. We therefore reject NMA's claims of conflicting agency requirements.

C. *30 C.F.R. § 75.332(a)(1)—Separate Air Splits*

■ 30 C.F.R. § 75.332(a)(1) provides:

Each working section and each area where mechanized mining equipment is being installed or removed, shall be ventilated by a separate split of intake air directed by overcasts, undercasts or other permanent ventilation controls.

According to NMA, a separate split of intake air should be required only in each area where mechanized mining equipment is being *removed.* The agency considered the suggestion that it exempt the installation of longwall equipment from the requirement. The suggestion was rejected, as noted in the rule's preamble, because installation of longwall equipment is labor intensive and requires cutting and welding, increasing the possibility of fire or explosion. 61 Fed.Reg. 9782. This discussion indicates that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. at 2866. We, therefore, reject this challenge to the rule.

D. *30 C.F.R. § 75.360(a)(1)—Preshift Examinations at Fixed Intervals*

During preshift examinations, inspectors determine the methane and oxygen levels in a coal mine, ensure that air is flowing through the mine properly, and generally check for hazardous conditions. *See* 30 C.F.R. § 75.360; 30 U.S.C. § 863(d). According to MSHA, preshift examinations are "the primary means of determining the effectiveness of a mine's ventilation system and of detecting developing hazards, such as methane accumulations, water accumulations, and bad roof." 61 Fed.Reg. 9790. The regulation that went into effect in 1996 requires examinations within "3 hours preceding the beginning of any 8–hour interval during which any person is scheduled to work or travel underground." 30 C.F.R. § 75.360(a)(1).

This regulation reflects a break with past practice. Beginning in 1952 with the Federal Coal Mine Safety Act, ch.,877, § 209(d)(7), 66 Stat. 692, 704 (1952), Congress required preshift examinations in "gassy" coal mines "within four hours immediately preceding the beginning of a coal-producing shift." The current statute, passed in 1969, requires preshift examinations "[w]ithin three hours immediately preceding the beginning of any shift, and before any miner in such shift enters the active workings of a coal mine." Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91–173, § 303(d)(1), 83 Stat. 742, 768 (codified at 30 U.S.C. § 863(d)(1)).

Regulations in effect between 1970 and 1992 incorporated the statutory language, requiring preshift examinations "[w]ithin 3 hours immediately preceding the beginning of any shift." *See* 35 Fed.Reg. 17,890, 17,900 (1970) (codified at 30 C.F.R. § 75.303(a) (1991)). The 1988 proposed rule and the 1992 final rule similarly required that "[w]ithin 3 hours preceding the beginning of any shift ... a certified person designated by the operator shall make a preshift examination." *See* 53 Fed.Reg. 2419; 57 Fed.Reg. 20,922. The rule proposed in 1994 made only a slight grammatical change and read: "a certified person designated by the operator shall make a preshift examination within 3 hours preceding the beginning of any shift." 59 Fed.Reg. 26,394.

Comments submitted to MSHA during the rulemaking convinced the agency that the existing regulatory regime had become unworkable because some mines were no longer

using standard eight hour shifts. *See* 61 Fed.Reg. 9791. If a mine used overlapping shifts beginning at two hour intervals, for example, one might suppose preshift examinations had to be conducted every two hours. To avoid such "controversies and misunderstandings," *id.*, the agency decided to establish some "reasonable period ... after which another examination is necessary," since conditions in a mine may change rapidly, *id.*

NMA raises both substantive and procedural objections to the new rule.

### 1. Substantive Objections

■ NMA's main substantive objection is that the regulation misreads "shift" in 30 U.S.C. § 863(d)(1) to mean an eight hour period. We do not see why the agency's interpretation of "shift" is impermissible. The word certainly can bear this meaning. In many instances and in varied contexts, Congress has treated eight hours as the standard work day. *See, e.g.*, 5 U.S.C. § 6101(a)(3)(D) (heads of federal agencies to provide that "the basic nonovertime workday may not exceed 8 hours"); 10 U.S.C. § 2431(b)(4)(B)(i) (for defense acquisition purposes, "most efficient production rate" defined with reference to eight hour shifts); 29 U.S.C. § 207(e)(7) (under Fair Labor Standards Act, "regular rate" of pay does not include premium pay for work outside "the basic, normal, or regular workday (not exceeding eight hours)"); 42 U.S.C. § 5196(j)(8) (when construction work is financed with federal funds made available to states for emergency preparedness purposes, construction workers must receive overtime for hours worked "in excess of eight hours in any workday"); 49 U.S.C. § 28301(a) (for certain railroad employees, "8 hours shall be a day's work and the standard day's work for determining [ ] compensation"). At the least, 30 C.F.R. § 75.360(a)(1) is a reasonable interpretation of open-ended statutory language. That is enough for us to defer to the agency under the familiar principles of *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–82.

Even if the regulation departed from the literal terms of 30 U.S.C. § 863(d)(1), that would not make it invalid. Section 863 contains "interim mandatory safety standards applicable ... until superseded in whole or in part by improved mandatory safety standards promulgated by the Secretary under the provisions of section 811 of this title." 30 U.S.C. § 861(a). Section 811 authorizes the Secretary of Labor to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). We see no reason why we should not think of 30 C.F.R. § 75.360(a)(1) as just such an "improved mandatory safety standard[ ]" issued in light of changed circumstances in the mining industry.

NMA also claims that 30 C.F.R. § 75.360(a)(1) is infirm because evidence in the record did not support a finding that safety considerations require conducting preshift examinations at eight hour intervals (rather than, say, nine or ten hour intervals). But NMA does not contest the agency's finding that the mining industry's use of overlapping shifts and other unconventional work schedules made it desirable to clarify when preshift examinations are required. What matters is whether the agency's choice of fixed eight hour intervals was a reasonable approach to the problem, not whether it was the only approach that would ensure miner safety. NMA has not shown that using fixed time intervals is unreasonable, or that eight hours is an unreasonable choice of interval.

### 2. Notice

NMA's procedural objection is that MSHA failed to comply with the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553, as 30 U.S.C. § 811(a) required it to do. NMA argues that the 1994 proposed rule, which followed the longstanding practice of requiring preshift examinations three hours before shifts begin, provided no notice that the agency would consider abandoning that approach in favor of preshift examinations at fixed intervals. Had it received proper notice, NMA says, it would have submitted comments to the agency showing that the new regulation, in conjunction with local law in some states, demands an excessive number of preshift examinations serving no safety purpose. It is conceivable

that if the agency had received such comments, it would have adjusted the final rule to take into account overlapping state law requirements.

■ Agencies are not limited to adopting final rules identical to proposed rules. No further notice and comment is required if a regulation is a "logical outgrowth" of the proposed rule. *See, e.g., Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C.Cir.1994). Our cases offer no precise definition of what counts as a "logical outgrowth." We ask "whether 'the purposes of notice and comment have been adequately served.'" *American Water Works Ass'n v. EPA,* 40 F.3d 1266, 1274 (D.C.Cir.1994) (quoting *Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1311 (D.C.Cir.1991)). Notice was inadequate when "the interested parties could not reasonably have 'anticipated the final rulemaking from the draft [rule].'" *Id.* at 1275 (quoting *Anne Arundel County v. EPA,* 963 F.2d 412, 418 (D.C.Cir.1992)). "[W]e inquire whether the notice given affords 'exposure to diverse public comment,' 'fairness to affected parties,' and 'an opportunity to develop evidence in the record.'" *Association of Am. Railroads v. Dep't of Transp.,* 38 F.3d 582, 589 (D.C.Cir.1994) (quoting *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983)).

■ It is clear to us that 30 C.F.R. § 75.360(a)(1) is not a "logical outgrowth" of the 1994 proposed rule. The regulation that went into effect in 1992, like the prior regulation, treated the timing of preshift examinations in the same way as the statute. In the discussion accompanying the 1992 final rule, the agency explained how it expected mine operators using overlapping shifts to comply. *See* 57 Fed.Reg. 20,893. The 1994 proposed rule made no substantive changes regarding when preshift examinations should occur. *See* 59 Fed.Reg. 26,394–95. The discussion accompanying the proposed rule dealt with preshift examinations in some detail, but the agency did not mention any problems with the timing of the examinations, and it did not express any interest in changing that aspect of the rule. *See* 59 Fed.Reg. 26,373–75. None of this would have alerted a reasonable interested party that the final rule might

alter the provisions about when preshift examinations must be conducted.

MSHA tells us that because the proposed rule addressed *how* preshift examinations would be conducted, it "raised the basic question of when such examinations should be conducted." If the 1994 proposed rule had been the agency's first attempt to regulate preshift examinations, it might well have been reasonable to think that all aspects of the rule were on the table and subject to revision. But the agency could not have expected parties to realize that it would consider abandoning a regulatory approach that dates to 1952 and a specific requirement that had been unchanged for twenty-five years simply because it was revising related regulations.

MSHA also argues that whatever the defects of the notice provided by the agency itself, NMA had actual notice that the agency was considering a regulation requiring preshift examinations at fixed intervals. We have said that "even if [an] agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless." *Small Refiner Lead Phase–Down Task Force,* 705 F.2d at 549. MSHA points out that an NMA member, Energy West Mining Co., proposed requiring preshift examinations at standard eight hour intervals both in written comments to the agency and at a public hearing attended by representatives of numerous members of NMA's predecessors. NMA admits that it had a transcript of that hearing. And a local trade group, the Utah Mining Association, made the same recommendations as Energy West in its written comments, suggesting that this was a topic of interest and discussion in the industry.

■ We are willing to assume that NMA knew of the comments suggesting preshift examinations at fixed intervals. But such knowledge alone cannot substitute for notice from the agency. Even if a party knows that a commenter has made some novel proposal to an agency during a rulemaking, the party cannot be expected to respond unless it has some reason to believe the agency will take the proposal seriously. Actual notice, then,

depends on awareness that the agency, despite its failure to alert the public, is considering adopting what the commenter has suggested. *Cf. Mid-Tex Elec. Coop., Inc. v. FERC,* 773 F.2d 327, 339 (D.C.Cir.1985) ("Petitioners had actual notice that FERC might adopt the alternative it ultimately chose."); *Sierra Club v. Costle,* 657 F.2d 298, 355 (D.C.Cir.1981) (parties had actual notice of "EPA's focus" on standard). Here, MSHA has given us no reason to suppose that NMA suspected a change in the forty year old practice of requiring preshift examinations a fixed number of hours before shifts begin. The petition for review is, therefore, granted with respect to 30 C.F.R. § 75.360(a)(1).

### E. *30 C.F.R. § 75.360(b)(9)—Preshift Examinations of Electrical Installations and Compressors*

The regulations include a list of locations subject to preshift examinations. The new rule adds to the list certain "[u]nderground electrical installations ... and areas where [certain] compressors ... are installed if the electrical installation or compressor is or will be energized during the shift." 30 C.F.R. § 75.360(b)(9). NMA raises two objections to this regulation.

#### 1. Other Regulations

NMA's first objection is that two other new regulations, 30 C.F.R. §§ 75.340 and 75.344, adequately address the hazards associated with electrical installations and compressors. Those regulations are aimed at containing fires, primarily through fire suppression systems and by housing electrical installations and compressors "in noncombustible structures or areas." NMA's contention is not, however, properly before us. No party raised it during the rulemaking. When a court reviews mine safety and health standards, "[n]o objection that has not been urged before the Secretary shall be considered by the court, unless the failure or neglect to urge such objection shall be excused for good cause shown." 30 U.S.C. § 811(d).

NMA points out that two industry commenters told the agency that they thought proposed § 75.360(b)(9) was unnecessary and wasteful. One commenter asserted that electrical installations are safely designed and have a safe operating history. The other told the agency that the type of equipment covered by § 75.360(b)(9) is already "protected by mandated electrical requirements, and, in many cases, continuous monitoring systems." But NMA's objection is not, as the commenters had argued, that § 75.360(b)(9) is unjustified against the backdrop of prior regulations regarding electrical requirements and monitoring. Rather, NMA argues that § 75.360(b)(9) is unnecessary in light of the additional safety now provided by the new steps mine operators must take under §§ 75.340 and 75.344 to contain fires. No party made that claim during the rulemaking.

 NMA suggests that this failure should be excused because §§ 75.340 and 75.344 were, in its words, "in flux" at the time of the rulemaking. Although the agency partially stayed an earlier version of § 75.344 in 1992, both §§ 75.340 and 75.344 were in the 1994 proposed rule that included proposed § 75.360. *See* 59 Fed.Reg. 26,394. We see no reason why §§ 75.340 and 75.344 were any more in flux and unworthy of attention than § 75.360. NMA also argues that since the commenters told MSHA that they believed earlier regulations made § 75.360(b)(9) unnecessary, the agency must have known that the commenters would also consider § 75.360(b)(9) unnecessary after the adoption of further safety standards. Be that as it may, 30 U.S.C. § 811(d) does not provide for constructive notice to the agency. Objections must actually have been made.

#### 2. Consistency with 30 U.S.C. § 863(d)(1)

NMA's second objection to 30 C.F.R. § 75.360(b)(9) is that the regulation somehow contradicts 30 U.S.C. § 863(d)(1). Section 863(d)(1) is the statutory provision regarding preshift examinations. The alleged contradiction is that while the statute distinguishes the "active workings" [3] of a coal mine from

---

**3.** The statute defines "active workings" as "any place in a coal mine where miners are normally required to work or travel." 30 U.S.C. § 878(g)(4).

other areas, the regulation requires examination of electrical installations and compressors wherever they may be. But the statute says that "before any miner ... enters the active workings of a coal mine, certified persons designated by the operator of the mine shall examine such workings *and any other underground area of the mine designated by the Secretary or his authorized representative.*" 30 U.S.C. § 863(d)(1) (emphasis added). The italicized language contemplates regulations like § 75.360(b)(9) requiring pre-shift examinations of mine areas other than the active workings.

In any event, tension between 30 U.S.C. § 863(d)(1) and 30 C.F.R. § 75.360(b)(9), is no basis for striking down the regulation. As noted above, the provisions of 30 U.S.C. § 863 are "interim mandatory safety standards applicable ... until superseded in whole or in part by improved mandatory safety standards promulgated by the Secretary under the provisions of section 811...." 30 U.S.C. § 861(a). Section 75.360(b)(9) is plainly authorized by the Secretary's general power to promulgate "mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines," 30 U.S.C. § 811(a).

F. *30 C.F.R. § 75.362(d)(2)—Methane Testing with Long Probes*

The regulations require on-shift methane testing "[a]t the start of each shift at each working place before electrically operated equipment is energized," "[i]mmediately before equipment is energized, taken into, or operated in a working place," and "[a]t 20–minute intervals ... during the operation of equipment in the working place." 30 C.F.R. § 75.362(d)(1); *see also* 30 U.S.C. § 863(h). It is important that methane testing be done at the "face"—where coal is being mined. This is where methane is most likely to build up to the levels at which an explosion is possible. It is also important that miners not venture forward of areas in which the mine roof is supported. For these reasons, 30 C.F.R. § 75.362(d)(2) requires that on-shift methane tests be done "at the face from under permanent roof support, using extendable probes or other acceptable means." Be-

cause some mines have equipment that allows mining at a face up to forty feet forward of the permanently supported roof, this regulation may require using methane detectors mounted on probes that extend to lengths more than forty feet. NMA raises four objections.

1. Back Injuries

NMA claims that using probes more than twenty feet long will lead to back injuries. As evidence, it cites the comments of a mining engineer at a public hearing. He estimated the weight a miner using a thirty foot probe would have to bear and concluded: "You got muscles acting in opposite directions.... I'm firmly convinced you're going to have back injuries as a result of this requirement." (The miners' union did not express any concern about back injuries among its members.)

The agency considered the possibility of back injuries. Noting that probes up to forty feet long have been used successfully, it concluded that the regulation does not present an "undue risk of back injuries." 61 Fed. Reg. 9801. No party presented the agency with any medical evidence on this subject. NMA relies on a mining engineer, not a medical professional, who had not participated in his company's study of back injuries. Miners who spoke at public hearings said that forty foot probes could be heavy and difficult to use, but they did not describe back injuries, and they said that forty foot probes do work. The record also shows that at least under some circumstances probes may be mounted with feet (called "salamanders") or other devices to reduce the strain on miners' backs. And it appears that miners in Pennsylvania have been using such lengthy probes without a significant rise in back problems. The agency's determination that the risk of back injuries did not outweigh the safety benefits of using long probes is not arbitrary or capricious.

2. Consistency with 30 C.F.R. § 75.323(a)

Under 30 C.F.R. § 75.323(a), methane testing must be done "at least 12 inches from the roof, face, ribs, and floor." NMA claims that 30 C.F.R. § 75.362(d)(2) is inconsistent

with § 75.323(a) because it is too difficult to maneuver a methane monitor at the end of a forty foot probe well enough to comply with § 75.323(a). NMA points to the comments of one miner who said that he could not keep a twenty-five foot probe off the ground and the statement of a mining union representative that probes with salamanders are "somewhat difficult to use sometimes, especially if you got a lot of spillage on the bottom."

Our initial problem with NMA's argument is its premise. It is hardly clear that § 75.323(a) covers tests conducted pursuant to § 75.362(d)(2). Section 75.323(a) says that it applies to "[t]ests for methane concentrations under this section." So it appears that methane tests conducted under another section need not comply with § 75.323(a). Our only hesitation about treating this point as dispositive is that by its own terms § 75.323 does not require any tests at all; the section is devoted to explaining what steps must be taken when various concentrations of methane are detected. It is thus hard to see what purpose § 75.323(a) might serve if its requirements do not apply to tests conducted under other sections. Putting that aside, we still sustain the regulation. Apart from the miner who could not keep a twenty-five foot probe off the ground, the evidence before the agency showed that while long probes might be difficult to use, they do work. At public hearings, at least two miners reported successfully using forty foot probes, one of whom said that such probes "were a little hard to handle but still they performed their job." And the union official who discussed difficulties maneuvering salamander-equipped probes "if you got a lot of spillage on the bottom" went on the say: "[U]ltimately they work. They . . . can and will work."

### 3. Machine–Mounted Monitors

■■■ NMA also objects to the agency's rejection of the suggestion that on-shift methane testing be done using methane monitors mounted on the mining equipment working at the face.

The agency points out that mining machinery is not constantly operating at the face. As NMA agreed at oral argument, the machinery is periodically withdrawn from the face, and methane may accumulate in the face area while the equipment is absent. So testing with a monitor mounted on a probe (or through some other means) is necessary to measure methane levels at the face before the mining machinery—which is a potential source of ignition—returns to the face area or enters the face area for the first time. The same is true if equipment in the face area is shut down; methane testing is necessary before the equipment is reenergized and becomes a possible ignition source.[4] Beyond insisting at oral argument that it "makes no sense whatsoever," NMA has not given us any reason to doubt this justification of the regulation.

■■■ Still, the agency could have been clearer about all this during the rulemaking. In adopting the final rule, MSHA said that machine-mounted monitors are unacceptable because they allow testing only from fixed locations and not at "various locations in the face area." 61 Fed.Reg. 9801. It is not obvious that this is the same rationale presented to the court. Perhaps when the agency said that the problem with machine-mounted monitors is that they can only be used from fixed locations, it meant that such a monitor can only measure methane wherever the machine happens to be located, which is not always at the face. In evaluating agency action, we look at the reasons given by the agency, not "counsel's *post hoc* rationalizations." *Motor Vehicle Mfrs.*, 463 U.S. at 50, 103 S.Ct. at 2870. "[W]e will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* at 43, 103 S.Ct. at 2866 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). NMA has not claimed ignorance of the actual reasons behind the agency's rejection of machine-

---

4. The agency's reasons for rejecting machine-mounted monitors extend only to situations in which mining equipment is not already energized and operating in the face area. The regulation requires methane testing "using extenda-ble probes or other acceptable means." We take it that the agency considers machine-mounted monitors to be "other acceptable means" for situations in which mining machinery is already operating at the face.

mounted monitors; and it has offered no response to the regulation's justification as articulated before the court. We therefore will not invalidate the regulation on the ground of inadequate agency explanation.

### 4. Technology Forcing and Enforcement Issues

NMA's fourth objection is that 30 C.F.R. § 75.362(d)(2) violates the standards for acceptable "technology forcing." According to NMA, Congress intended MSHA to defer the effective date of regulations that require currently unavailable equipment.[5] NMA also faults the agency for not following up on comments by the Bureau of Mines that it was developing an "optical methanometer" to allow methane testing from a distance.

■ Section 75.362(d)(2) is not, as we see it, a technology-forcing standard. Forty foot extendable probes were available at the time this regulation was adopted. Miners described successfully using forty foot probes. And at a public hearing, a union official provided the name, address, and telephone number of one manufacturer of such devices. It may be that forty foot extendable probes were not immediately available in sufficient quantities, but NMA acknowledges that the agency initially allowed mine operators to demonstrate compliance with the regulation by producing purchase orders for the probes they would need. NMA does not explain why this did not sufficiently accommodate the industry's needs.[6] Nothing about the agency's enforcement position is arbitrary or capricious or inconsistent with any purported congressional intent that mine operators not be forced to comply with regulations before the required technology exists.

As to the Bureau of Mines's comment about an "optical methanometer," it is unclear what more NMA thinks MSHA should have done. The regulation requires methane tests "using extendable probes or other acceptable means." There is nothing to indicate that such a device would not fall into the category of "other acceptable means." That technology superior to extendable probes may eventually become available is no reason for not requiring probes in the meantime.

### III. UMWA's Challenges

■ We turn now to the challenges brought by the Union, the first of which are premised on the Union's contention that the rules violate the "no-less protection" rule of Section 101(a)(9) of the Act. 30 U.S.C. § 811(a)(9). Under the no-less protection rule, the Secretary's authority to replace existing mandatory health and safety standards is subject to the limitation that "[n]o mandatory health or safety standard ... shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). This Court has interpreted the rule to require that

> when new standards replace existing mandatory health or safety standards it is not sufficient that the new standards demonstrate a reasonable accommodation of the competing goals of safety and efficient coal mine operation. The statute expressly mandates that no reductions in the level of safety below existing levels be permitted, regardless of the benefits accruing to improved efficiency.

*United Mine Workers v. Dole,* 870 F.2d 662, 666 (D.C.Cir.1989). The rule of no-less pro-

---

**5.** NMA cites the legislative history of the Federal Mine Safety and Health Act of 1977. In the context of a provision regarding standards for "toxic substances and harmful physical agents," the Senate report said that the Secretary may promulgate regulations that are technology-forcing in the sense of requiring technology that is not yet available but that "looms on today's horizon." S. REP. No. 95–181, at 21 (1977), U.S.Code Cong. & Admin.News 1977, at pp. 3401, 3421. In the next paragraph, the report stated that financially burdensome regulations may be justified, and that "[w]here substantial financial outlays" are necessary for compliance, "other regulatory strategies are available to ac-

commodate economic feasibility and health considerations. These strategies could include delaying implementation of certain provisions or requirements of standards ... or a delay in the effective date of the standard." *Id.* at 22. We are unsure how NMA translates the Committee's statements into commands to MSHA.

**6.** MSHA has since concluded that probes are now readily available in the market, and presentation of a purchase order no longer suffices for compliance. We have no reason to question this decision.

tection is a "strict one" that imposes "an explicit constraint on the Secretary's authority." *Id.* at 673 n. 19, 666.

■ However, while the Act imposes unusual limitations on the Secretary's authority, it does not require that this Court disregard well-established principles of deference to agency action. Section 101(a)(9) requires the agency to state the basis for its conclusion that the rule has been satisfied, but this Court's review of that substantive determination is, as always, "highly deferential and presumes the validity of agency action." *Id.* at 666 (quoting *Motor Vehicle Mfrs.,* 719 F.2d at 1164). With these principles in mind, we turn to the Union's no-less protection challenges. In each case we find no grounds to conclude that the Secretary failed to engage in reasoned decisionmaking.

A. *30 C.F.R. § 75.313(d)(2)—Miners May Stop Evacuation Upon Fan Restart*

Underground coal mines must be "ventilated by one or more main mine fans." 30 C.F.R. § 75.302. "The main mine fan provides the pressure that causes air to move through the mine to dilute and carry away explosive and toxic gases, dusts and fumes." 61 Fed.Reg. 9769. A mine must be evacuated if the main mine fan stops.

■ The old regulation required mine operators to develop a plan providing "that when any mine fan stops, immediate action shall be taken ... to withdraw all persons from the working sections, ... [and] to provide for withdrawal of all persons from the mine if ventilation cannot be restored within [a] reasonable time." 30 C.F.R. § 75.321 (1991). Unless the agency approved a different time period, "reasonable time" meant fifteen minutes. 30 C.F.R. § 75.321–1 (1991).

The new rule does not rely on plans for individual mines. Instead, it imposes blanket requirements on all mines that if the main mine fan stops "[e]veryone shall be withdrawn from the working sections and areas where mechanized mining equipment is being installed or removed," 30 C.F.R. § 75.313(a)(3), and that "[i]f ventilation is not

restored within 15 minutes ... [e]veryone shall be withdrawn from the mine," 30 C.F.R. § 75.313(c)(1). The new rule also addresses the situation in which the fan restarts before miners have finished evacuating the mine: "If ventilation is restored to the mine before miners reach the surface, the miners may return to underground working areas only after an examination of the areas is made ... and the areas are determined to be safe." 30 C.F.R. § 75.313(d)(2).

The Union claims that § 75.313(d)(2) violates the no-less protection rule because it allows miners to remain underground after the fan restarts,[7] whereas the old standard contained no such provision. The problem with this claim is that while the old standard did not expressly permit the practice, it also did not prohibit miners from remaining underground after ventilation was restored while they waited for their working areas to be examined before returning to work. The old regulation said nothing at all about what happens when the fan restarts before miners have left the mine, and it certainly did not require that evacuation continue. So the new rule does not appear to be any less protective than the old one.

The Union suggests that the new rule reduces safety because it permits miners in all mines to remain underground after the fan restarts, while the old rule left this matter to the plans the agency approved for individual mines. The Union reasons that while some plans may have allowed miners to remain underground, others may have required evacuation to continue even after the fan restarted, and in all cases the agency had the power to require that a mine's plan provide for such continuing evacuation. But the agency found that § 75.313(d)(2) reflects what was already the mining industry's "general practice." 61 Fed.Reg. 9775; *see also* 57 Fed.Reg. 20,875. Of plans developed under the old regulation, slightly more than 25% explicitly provided that miners would remain underground if they had not yet left the mine when the fan restarted. More importantly, *no* plan prevented a mine operator from following industry practice and keeping miners

7. We might have doubted whether the regulation's language really allows this, but the agency shares the Union's understanding of the rule, *see* 61 Fed.Reg. 9774–75.

underground after the fan restarted. So nothing has changed under the new rule. Under both the old and the new rules, all mine operators have the option of keeping miners underground if they have not yet left the mine when the main mine fan restarts. Nothing about the new rule should make them any more or less likely to do so.

B. *30 C.F.R. § 75.313(c)(2)—Deenergization of Electric Power Circuits When the Fan is Stopped*

■ 30 C.F.R. § 75.313(c)(2) requires that unless ventilation is restored within 15 minutes after a main mine fan stops electric power circuits shall be deenergized. The section creates an exception for power circuits that operate transportation equipment used to evacuate miners. In such cases, the circuits "need not be deenergized if located in areas or haulageways where methane is not likely to migrate to or accumulate." The Union argues that the new standard provides less protection to miners than the previous standard, 30 C.F.R. § 75.321, which required "immediate action ... to cut off the power in the mine" without an exception for transportation equipment. The Union argues that the safer course is to deenergize and evacuate miners by foot.

We reject the Union's challenge because we are required to defer to the agency on factual determinations underlying its decision. In this case, the agency has determined that the safety benefit gained by rapid evacuation of miners outweighs the risk of ignition. We are poorly positioned to second-guess the agency on the balancing of these two concerns.[8]

C. *30 C.F.R. § 75.311(c)—Mine Operators Can Order Miners Underground with Only "Back–Up" Fans for Ventilation*

■ Section 75.311(c) provides that "[w]hen a back-up fan is used that does not provide the ventilating quantity provided by the main mine fan, persons may be permitted in the mine and electric power circuits may be energized as specified in the approved ventilation plan." The pre–1992 standard did not mention "back up" fans, although it did contemplate the use of multiple fans. 30 C.F.R. § 75.300–3(c) (1991). The Union contends that § 75.311(c) violates the no-less protection rule because "[a]llowing the use of back-up fans can potentially endanger miners," as their use could disturb precise ventilation systems which "produce a delicate balance of air velocities, quantities, and pressures." The Union relies on a report of an investigation at a mine that concluded, in part, that upon the failure of the mine fan, "disruption in ventilation virtually stopped the flow of air" in the mine, thereby allowing methane to accumulate. The Union also contends that § 75.311(c) is too vague, in that "the Secretary has failed to adequately set forth any criteria for what specific activities will be allowed and under what specific ventilating conditions."

The Secretary points out, however, that "since [s]ection 75.311(c) strictly regulates a practice which was unregulated in the past, it is clear that ... protection by definition is increased under the new standard." Under the new standard, when the main mine fan is not in operation, the mine operator may only permit persons to enter the mine if a backup fan is used, and if the tasks they are to perform are those specified in an approved ventilation plan. *See* 57 Fed.Reg. 20,868, 20,873 (1992). The Secretary further points out that the new standard responds to the current practice of using back-up fans. Further, he maintains persuasively that § 75.311(c) is not vague because the regulation makes clear that an approved ventilation plan must assure that when back-up fans are relied upon, persons may enter the mine only

---

**8.** We note that the Mine Safety and Health Administration has by advice letter stated: "Since the areas where methane is likely to migrate or accumulate if powered equipment is to be used for withdrawal cannot be identified once evacuation is imminent, MSHA expects that the operator will ascertain these areas in advance if the operator uses powered equipment for withdrawal, and that knowledge of any such areas be made available to the miners' representatives and MSHA personnel. Questionable areas ... could lead to tests ... or other means to evaluate these areas." Letter of Marvin W. Nichols, Jr., Administrator, Mine Safety and Health Administration, 5 September 1996. MSHA's letter further expressed its intention to include that same information in its compliance guide for the ventilation rule.

for "activity which is related to maintaining the mine in a safe condition," such as "pumping, urgent roof support installation, or other safety-related work." 59 Fed.Reg. 26,356, 26,361 (1994). In addition, the production of coal when a back-up fan is in use still requires approval by the Secretary, as it "would not be permitted unless the mine were adequately ventilated and a new ventilation plan has been approved." *Id.* Put otherwise, the new regulations ensure that when backup fans are in use that provide less than full ventilation, the range of permissible activities will be limited to those that are emergency in nature, and that can safely be performed with less ventilation than usual. Hence, we conclude that the Secretary has met his no-less protection burden.

### D. *30 C.F.R. § 75.311(b)(1)—Intentional Fan Stoppage*

 Section 75.311(b)[9] must be read in conjunction with § 75.311(a),[10] which specifies the circumstances in which an operator may intentionally stop the main mine fan. Under the prior standard, a mine operator could stop the mine fan unilaterally only for "[s]cheduled maintenance or adjustments on idle days when all men other than those performing evaluation or adjustments are withdrawn from the mine and the mine power is cut off." 30 C.F.R. § 75.300–3(a)(1) (1991). For all other stoppages, the mine operator was required to obtain written permission "from an authorized representative of the Secretary." *Id.* § 75.300–3(a)(3) (1991). The Union contends that § 75.311(b)(1) violates the no-less protection rule because the standard "would allow the [mine] operator, without permission, to allow a greater number of miners into the mine, while the fan is stopped, to engage in more

activities than previously allowed," and because "the standard is vague and does not adequately limit the number of miners and scope of work allowed...."

The Secretary notes that the new standard does not create any additional grounds for stopping a fan intentionally that were not permissible under the prior standard. Rather, § 75.311(a) and § 75.311(b)(1) simply "clarif[y] what type of work may be conducted underground during an intentional fan stoppage, and by whom." Further, the standard is not impermissibly vague because it allows "[o]nly persons necessary" to accomplish the tasks described in § 75.311(a) and § 75.311(b)(1) to enter the mine when the fan is stopped. In further defining who will be permitted to enter a mine during a stoppage, the Secretary relies on the preamble to the 1994 proposed rule that states: "[t]he maintenance or repair work which could not be made while the fan is operating is limited to work or repair which would endanger the safety of the worker if the fan were operating." 59 Fed.Reg. 26,361–62. Thus, the new rule is different only in that while the mine operator was previously required to obtain the Secretary's prior approval for stoppages that did not take place on idle days, the regulation now specifies when such stoppages are permissible, and what work may be performed during the stoppage. The Union offers nothing to counter the Secretary's contention that substituting a requirement for prior approval with a detailed set of compulsory regulations will not lessen safety.

Moreover, the Secretary's response demonstrates that the Union's vagueness challenge is meritless. While the previous standard permitted intentional fan stoppage for "[s]cheduled maintenance or adjustments," 30 C.F.R. § 75.300–3(a)(1) (1991), and per-

---

9. Section 75.311(b) (1996) provides:

Except as provided in paragraph (c) of this section, when a main mine fan is intentionally stopped and the ventilating quantity provided by the fan is not maintained by a back-up fan system—
(1) [o]nly persons necessary to evaluate the effect of the fan stoppage or restart, or to perform maintenance or repair work that cannot otherwise be made while the fan is operating, shall be permitted underground....

10. Section 75.311(a) (1996) provides:

Main mine fans shall be continuously operated, except as otherwise approved in the ventilation plan, or when intentionally stopped for testing of automatic closing doors and automatic fan signal devices, maintenance or adjustment of the fan, or to perform maintenance or repair work underground that cannot otherwise be made while the fan is operating.

mitted persons performing such maintenance or adjustments to enter the mine at such times, the new regulations limit access to persons evaluating the effects of the fan stoppage or restart, or performing maintenance or repair work that "cannot otherwise be made while the fan is operating." § 75.211(b)(1). The category of circumstances and persons who may enter the mine during a stoppage is thus more specifically defined under the new rule than it was previously.

### E. *30 C.F.R. § 75.360(b)—Preshift Examinations*

Both the prior and new standards require a certified examiner to conduct an examination of any working area of the mine that miners will enter during the subsequent work shift. The preshift examination must be made at fixed intervals, "within three hours preceding the beginning of an 8–hour interval during which any person is ... to work or travel underground." 30 C.F.R. § 75.360(a)(1) (1996). The prior standard, 30 C.F.R. § 75.303(a) (1991), required the examiner to investigate several specified areas of the mine for specific hazards, as well as for violations of mandatory health and safety standards.[11] The Union contends that § 75.360(b) decreases the level of protection afforded miners by the preshift examination by deleting the requirement that the examiner search for "violations of mandatory health or safety standards," and requiring instead that "[t]he person conducting the preshift examination shall examine for hazardous conditions, test for methane and oxygen deficiency, and determine if the air is moving in its proper direction" in several delineated locations within the mine. 30 C.F.R. § 75.360(b). Specifically, the Union maintains that the eliminated requirements as to safety and health standards "encouraged

mine operators to take steps to remove the unsafe conditions."

The Secretary emphasizes, however, that the focus of the prior standard was on identifying and correcting developing hazards. Relying on the statement made in promulgating § 75.360(b) in 1992, that "the final rule does not include a provision authorizing expansion of the preshift examination to include examination for violations of mandatory standards," 57 Fed.Reg. 20,894, the Secretary contends that he "never construed the previous standard to require identification of every violation of a mandatory standard, regardless of whether it involved a currently hazardous condition or not." The Secretary relies on two phrases in the prior standard to support his position. First, under § 75.303(a) (1991), the Secretary was to determine "from time to time" to what extent preshift examinations would involve examination for violations of mandatory health and safety standards. Second, the prior standard should be interpreted, in the Secretary's view, as requiring examinations only of health and safety violations that would be characterized as "hazardous" under § 75.360(b). The Secretary contends that because the previous rule only required examination of standard violations that were hazardous or that had been specially designated by the Secretary, § 75.360(b), which requires examination of all hazardous conditions, is consistent with the no-less protection rule.

The Union does not offer any evidence to dispute the Secretary's position. The Secretary properly emphasizes that because the purpose of the examination is to identify current hazardous conditions, requiring reporting of all instances of noncompliance with safety and health standards could distract examiners from the primary focus of their task, and lessen the efficiency of examina-

---

11. Section 75.303(a) provided that:
 [The] examiner shall ... examine for such other hazards and violations of the mandatory health or safety standards, as an authorized representative of the Secretary may from time to time require ... If such mine examiner finds a condition which constitutes a violation

of a mandatory health or safety standard or any condition which is hazardous to persons who may enter or be in such area, he shall indicate such hazardous place by posting a "danger" sign conspicuously at all points which persons entering such hazardous place

tions.[12] In repromulgating § 75.360(b) in 1996, the Secretary stated:

> Preshift examinations assess the overall safety conditions in the mine; assure that critical areas are properly ventilated; assure that the mine is safe to be entered by miners on the oncoming shift; identify hazards, whether violations or not, for the protection of miners; and through this identification facilitate correction of hazardous conditions.
>
> The preshift examination requirements in the final rule are intended to focus the attention of the examiner in critical areas. This approach is consistent with the fundamental purpose of preshift examinations which is to discover conditions that pose a hazard to miners. MSHA is persuaded that to require examiners to look for violations that might become a hazard could distract examiners from their primary duties.

61 Fed.Reg. 9,764, 9,793 (1996).[13]

The comments submitted by mine operators further emphasize the need to permit examiners to perform their task efficiently by focusing on identifying hazards without also being required to investigate all violations of health and safety standards. As the Secretary observes, the comments "support the conclusion that requiring preshift examiners to identify noncompliance with mandatory safety and health standards 'would distract the examiner from the most important aspects of the preshift examination' and 'would result in a shift in focus of preshift examination from true hazards to noncompliance.'" (quoting 61 Fed.Reg. 9,793). Consequently, the Union is in the odd position of urging that preshift inspector's attention be, in effect, diverted away from investigating hazards, the principal reason behind requiring preshift examinations.

## F. *30 C.F.R. § 75.380(d)(3), (d)(4)—Escapeway Height and Width*

■■■ Section 75.380(d) (1996) establishes height and width requirements for escapeways within coal mines. The Union contends that subsections (d)(3),[14] (d)(4)(iii),[15] and (d)(4)(iv),[16] violate the no-less protection rule

---

would be required to pass, and shall notify the operator of the mine.

12. Consideration of this type of efficiency is distinct from that proscribed by *Dole*, 870 F.2d at 666, because requiring preshift examiners to focus on identifying hazards presumably increases, rather than decreases, safety for miners.

13. In promulgating § 75.360(b) in 1992, the Secretary stated:

> MSHA believes that authorizing the district manager to require the preshift examination to include examination for other hazards ensures that preshift examinations are tailored to provide the necessary protection for miners. Also requiring the preshift examiner to look for all violations regardless of whether they involve a hazard could distract the examiner from the more important aspects of the examination. The preshift examination is designed to concentrate the examiners['] efforts in those areas where they are most suitably applied.

57 Fed.Reg. 20,894.

14. Section 75.380(d)(3) provides that each escapeway must be

> [m]aintained to at least a height of 5 feet from the mine floor to the mine roof, excluding the thickness of any roof support, except that the escapeways shall be maintained to at least the height of the coalbed, excluding the thickness of any roof support, where the coalbed is less than 5 feet. In areas of mines where escape-

ways pass through doors, the height may be less than 5 feet, provided that sufficient height is maintained to enable miners, including disabled persons, to escape quickly in an emergency. In areas of mines developed before November 16, 1992, where escapeways pass over or under overcasts or undercasts, the height may be less than 5 feet provided that sufficient height is maintained to enable miners, including disabled persons, to escape quickly in an emergency.

30 C.F.R. § 75.380(d)(3) (1996).

15. Section 75.380(d)(4)(iii) provides an exception to the general rule set forth in § 75.380(d)(4) that escapeways shall be "[m]aintained at least 6 feet wide"

> [w]here the alternate escapeway passes through doors or other permanent ventilation controls or where supplemental roof support is required and sufficient width is maintained to enable miners, including disabled persons, to escape quickly in an emergency.

30 C.F.R. § 75.380(d)(4)(iii) (1996).

16. Section 75.380(d)(4)(iv) also provides an exception to the requirement of § 75.380(d)(4), and provides:

> Where mobile equipment near working sections, and other equipment essential to the ongoing operation of longwall sections, is necessary during normal mining operations, such

"by forfeiting the individualized review for variances from the six foot wide and five foot height standard ... irrespective of any asserted need for the reduction and without MSHA's particularized consideration." All three challenged provisions operate subject to the same underlying criterion: "[w]hen there is a need to determine whether sufficient [height or width] is provided, MSHA may require a stretcher test where 4 persons carry a miner through the area in question on a stretcher." 30 C.F.R. § 75.380(d)(3), (d)(4)(iii), (d)(4)(iv). Prior to 1992, the standard included specific heights and widths for all escapeways, although the Secretary, acting through the District Manager, could approve alternate heights and widths as long as the escapeways would enable miners to escape quickly to the surface in the event of an emergency. *See* 30 C.F.R. § 75.1704 (1991).

The Union's challenge to the regulations is both speculative and meritless. As the Secretary points out, all three regulations mandate that escapeways must be sufficiently high and wide to enable a disabled miner to escape quickly through the mine, in compli-

ance with the Mine Act. 30 U.S.C. § 877(f)(1) ("Escape facilities ... shall ... allow all persons, including disabled persons, to escape quickly to the surface in the event of an emergency."). The 1996 regulations clarify a previously vague standard. Even if the elimination of the approval requirement represents a departure from prior practice under the pre–1992 regulation because lesser dimensions were routinely approved under the old rule, there is no evidence to negate the Secretary's contention that shifting decisionmaking authority to mine operators will lessen protection.[17] The Secretary reasonably concluded that, by requiring the stretcher test and limiting the number of exceptions to the general rule in § 75.380(d)(4), the current regulation increases safety, even though it eliminates the Secretary's previous control over granting variances to the height and width requirements.[18]

G. *30 C.F.R. § 75.312(b)(1)—Main Mine Fan Monitoring*

■■■ Section § 75.312(a)(1996) provides that "[e]xaminations of main mine fans shall

---

as material cars containing rock dust or roof control supplies, or is to be used for the evacuation of miners off the section in the event of an emergency. In any event, escapeways shall be of sufficient width to enable miners, including disabled persons, to escape quickly in an emergency.

30 C.F.R. § 75.380(d)(4)(iv) (1996).

17. The Secretary determined that such clarifications, setting forth the stretcher test requirement, provide no less protection than did the prior regulation:

Under the previous rule, escapeway dimensions were addressed through criteria and operators routinely requested and received approval for lesser dimensions than that in criteria based on a performance test referred to as a "stretcher" test ... The purpose of the "stretcher test" was to demonstrate that the lesser dimension would not delay escape. The final rule permits lesser escapeway heights and widths under specific circumstances provided the height and width maintained enable miners to escape quickly in an emergency. The final rule requires that when there is a need to determine whether sufficient height or width is provided, MSHA may require a stretcher test where 4 persons carry a miner through the area in question on a stretcher ... MSHA's experience is that the stretcher test provides a good measure of the ability of miners to escape.

Since the escape of miners is not impeded, the demonstrations that there is no delay is escape assures that there is no reduction in safety.

. . .

[T]he final rule maintains the historical approach taken to addressing issues of clearance in the confined environment of underground coal mines. The final rule, while permitting reduced dimensions near working sections ... requires that the escapeways always be maintained of sufficient width to enable miners, including disabled persons, to escape quickly in an emergency.

61 Fed.Reg. 9811–12.

18. The Secretary also reasonably concluded that the new regulation increased safety in several ways. Allowing smaller spaces in escapeways in limited circumstances may increase safety in that, because "significant pressure differentials can exist in escapeways, doors which are less than 5 feet are easier to open." 61 Fed.Reg. 9811. In any event, "there are normally few doors in an escapeway and the distance traversed in a door is very short." *Id.* Conversely, maintaining a five-foot height requirement in some instances could have resulted in a diminution of miner safety by requiring "removal of roof supports or lowering of the tops of overcasts to provide the 5–foot height required by the existing rule." *Id.*

be made at least once each day that the fan operates, unless a fan monitoring system is used."[19] The Union contends that § 75.312(b)(1) reduces the level of protection provided by the pre–1992 rule, 30 C.F.R. § 75.300–4(a) (1991), which required that all main mine fans be "inspected daily ... to insure the electrical and mechanical reliability of such fans." Specifically, the Union contends that the continuous automatic monitoring system *plus* a weekly visual examination provides less protection than daily visual inspections did because:

> [m]ine fan monitoring technology cannot identify visual cracks in the fan housing, moisture accumulation around the electrical fan components or combustible material around the installation. Mine fans are outside, and many times in remote locations, so daily, physical examinations can detect dangers from the elements. Moreover, monitoring technology does not protect against vandalism the way a regular physical presence can.

In promulgating the 1992 version of the regulation, the Secretary stated that "[t]he final rule requires the main fan monitoring system to supply at least as much information regarding fan performance as the daily examination ... Unlike the information resulting from the daily examination, the monitoring system provides a continuous profile of fan performance." 57 Fed.Reg. 20,874. This is supplemented by a weekly visual examination, as mandated by 30 C.F.R. § 75.312(b)(1)(ii)(B). Thus, the combined system, with an automatic and continuous monitoring system, adds protection: "MSHA believes that main fan monitoring systems represent improved technology with the po-

tential to provide greater safety." 57 Fed. Reg. 20,874.

Where an evaluation is to be made of the net safety effects of a change in a regulation, the court properly defers to the Secretary's evaluation that "[w]eekly visual examinations are sufficient to detect the type of problems given as examples by [the Union] of what only visual examinations can detect in sufficient time to prevent significant hazards from developing" and that "[t]he short-effects of these concerns are not, from a safety standpoint, sufficiently consequential to warrant daily visual examinations in addition to a continuous monitoring system." *See Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 963–64 (D.C.Cir.1990) (*"Emerald Resources"*). The Union has pointed to no reason to conclude that the Secretary's determination that any possible decrease in safety that might occur by requiring an examiner to inspect visually the fan weekly rather than daily is outweighed by the increased safety in the use of an automatic, continuous monitor at all times. Moreover, as the Secretary noted at oral argument, the great expense associated with repairing or replacing main mine fans provides an incentive for the mine operator to act promptly to correct any defects noted in the weekly visual examination that might damage or otherwise interfere with the normal operation of the fan.

The Union's remaining challenges under the no-less protection rule require only brief comment because they too involve challenges to the Secretary's net effects determinations that the new regulation will not diminish the level of safety for miners that existed under the prior regulations.

---

**19.** If a mine operator chooses to employ an automated monitoring system, then § 75.312(b)(1) provides that a "trained person designated by the operator" shall:

(i) At least once each day review the data provided by the fan monitoring system to assure that the fan and the fan monitoring system are operating properly. No review is required on any day when no one, including certified persons, goes underground, except that a review of the data shall be performed prior to anyone entering the underground por-

tion of the mine. Data reviewed should include the fan pressure, bearing temperature, revolutions per minute, vibration, electric voltage, and amperage; and

(ii) At least every 7 days—

(A) Test the monitoring system for proper operation; and

(B) Examine each main mine fan and its associated components to assure electrical and mechanical reliability of main mine fans.

30 C.F.R. § 75.312(b)(1) (1996).

H. *30 C.F.R. §§ 75.311(d) & 75.312(g)(1)— Notification and Recording Requirements*

▮▮ The Union's claim that § 75.311(d) [20] violates the no-less protection rule because "[t]he old regulations required that examiners notify the mine supervisor when problems with the main mine fan were discovered," while "[t]he new regulations only require that examiners notify the 'mine foreman,'" is meritless. The previous rule, by using the conjunctive "or" in front of the words "mine foreman," provided that full compliance was achieved by notification of the mine foreman. Likewise, § 75.311(d) requires notification of the "mine foreman or equivalent mine official." As to § 75.311(d)'s provision regarding who should be notified if there is no mine foreman at a particular mine, the Secretary explained in the preamble to the 1996 rule:

> [C]onsistent with other sections of the final rule and recognizing that the term mine foreman is not used at some mines, the final rule requires that if an unusual variance in the mine ventilation pressure is observed, or if an electrical of mechanical deficiency of a main mine fan is detected, the mine foreman or equivalent mine official, or in the absence of the mine foreman or equivalent mine official, a designated certified person acting for the mine foreman or equivalent mine official shall be notified immediately.

61 Fed.Reg. 9770. Section 75.311(d) therefore accommodates the fact that all mines may not use the term "foreman," and the Secretary thus properly concluded that § 75.311(d) accords miners no-less protection than did the previous regulation.

▮▮ The Union's challenge to the new recording regulation is no more persuasive.

The Union contends that § 75.312(g)(1) [21] violates the no-less protection rule because it requires only that examiners record "uncorrected defects that may affect the operation of the fan that are not corrected by the end of the shift." By contrast, the pre–1992 regulation provided that "[r]esults of the inspections [of the main mine fan] shall be recorded in a daily fan inspection book approved by the Secretary." 30 C.F.R. § 75.300–4(d) (1991).

The Secretary points out that the previous standard provided no more protection than § 75.312(g) because "no safety purpose is served by requiring examiners to record problems beyond those described in Section 75.312(g)(1)." The Secretary stated in the preamble to the 1996 rule:

> The final rule is intended to address problems found during fan examinations that may indicate more serious defects and ultimately lead to a fan failure and that cannot be corrected by the end of the shift. The objective is to record defects of a nature and seriousness that could result in a fan failure, but not to record defects that are so minor that it would be unreasonable to expect fan failure to result.

61 Fed.Reg. 9772. Given our deference to the Secretary's determination of net effects, *see Emerald Resources,* 920 F.2d at 963–64, we find unpersuasive the Union's contention that the new regulation removes any incentive for mine operators to discover and correct minor problems with the mine fan that are corrected by the end of a shift but could aggregate and later produce fan failure. The Secretary has explained that "[t]he econom-

---

**20.** Section 75.311(d) provides:

> If an unusual variance in the mine ventilation pressure is observed, or if an electrical or mechanical deficiency of a main mine fan is detected, the mine foreman or equivalent mine official, or in the absence of the mine foreman or equivalent mine official, a designated certified person acting for the mine foreman or equivalent mine official shall be notified immediately, and appropriate action or repairs shall be instituted promptly.

30 C.F.R. § 75.311(d) (1996). The prior rule provided:

> If an unusual variance in the mine ventilation pressure is observed, or if an electrical or mechanical deficiency of a main fan is detect-

ed, the mine superintendent or assistant mine superintendent or mine foreman should be notified immediately and appropriate action or repairs should be instituted promptly.

30 C.F.R. § 75.300–3(b) (1991).

**21.** Section 75.312(g)(1) provides:

> By the end of the shift on which the examination is made, persons making main mine fan examinations shall record all uncorrected defects that may affect the operation of the fan that are not corrected by the end of the shift. Records shall be maintained in a secure book that is not susceptible to alteration or electronically in a computer system so as to be secure and not susceptible to alteration.

30 C.F.R. § 75.312(g)(1) (1996).

544

ics of allowing problems that do not yet affect operation of the fan to develop into serious problems that 'may affect operation of the fan' . . . are such that operators have an incentive to monitor and correct such problems rather than pay for costly repairs or fan replacement later."

### I. 30 C.F.R. § 75.324—Ventilation Changes

Section 75.324 sets forth conditions under which intentional ventilation changes may be made.[22] The Union contends that the regulation, which contains no recording requirement, results in a reduction in protection from the pre–1992 standards. Citing 30 C.F.R. § 75.323 (1991), the Union maintains that "[r]emoving recording requirements discourages mine operators from providing safe ventilation changes." As the Secretary submits, no reduction in protection is presented. Section 75.323 of the pre–1992 rule provided for the countersigning of daily and weekly reports required under other regulations; it did not contain any recording requirement itself.[23] Section 75.322 (1991), covering intentional ventilation changes, likewise contained no recording requirement. Hence, § 75.324 (1996) does not take away pre-existing recordation and countersigning protections; they never existed.[24] It is true that, as a matter of policy, the MSHA in its Program Policy Manual established a recordation requirement for ventilation changes in any split of air that was to be increased or decreased by more than 9,000 cubic feet per minute. But the elimination of the recording requirement in cases where power may not be restored to the areas affected by the

change until a preshift examination was completed and recorded, pursuant to 30 C.F.R. § 75.303 (1991), would only violate the no-less protection rule if the directive in the Policy Manual constituted a "mandatory health or safety standard" under 30 U.S.C. § 811(a)(9), which it does not. See Vietnam Veterans v. Sec'y of the Navy, 843 F.2d 528, 536–38 (D.C.Cir.1988); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 536–38 (D.C.Cir.1986); see also Jolly v. Listerman, 672 F.2d 935, 940–41 (D.C.Cir.), cert. denied, 459 U.S. 1037, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982).

### J. 30 C.F.R. § 75.360(f)—Countersigning of Preshift Records

Section 30 C.F.R. § 75.360(f)(1996) provides, in relevant part:

> All preshift and corrective actions records shall be countersigned by the mine foreman or equivalent mine official by the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift.

The Union contends that allowing until the end of the foreman's next shift for countersigning violates the no-less protection rule because the pre–1992 regulation required such countersigning to occur "promptly." 30 C.F.R. § 75.323 (1991). Specifically, the Union maintains that § 75.360(f) "prolong[s] this counter-signing" and that "[g]ranting the mine foreman more time frustrates the immediacy with which corrective action will be taken." But, as the Secretary explained, the

---

22. Section 75.324(b) provides that intentional ventilation changes should be made only under certain conditions:

> (1) Electric power shall be removed from areas affected by the ventilation change and mechanized equipment in those areas shall be shut off before the ventilation changes begin. (2) Only persons making the change in ventilation shall be in the mine. (3) Electric power shall not be restored to the areas affected by the ventilation change and mechanized equipment shall not be restarted until a certified person has examined these areas for methane accumulation and for oxygen deficiency and has determined that the areas are safe.

30 C.F.R. § 75.324(b) (1996).

23. Section 73.323 provided:

> The mine foreman shall read and countersign promptly the daily reports of the preshift examiner and assistant mine foreman, and he shall read and countersign promptly the weekly report covering the examinations for hazardous conditions . . . The mine superintendent or assistant superintendent of the mine shall also read and countersign the daily and weekly reports of such persons.

30 C.F.R. § 75.323 (1991).

24. There is no record evidence that, in practice, the Secretary required recordation and countersigning of intentional ventilation changes, despite the lack of any mandate in the regulations. Hence, the Union cannot contend that § 75.324

pre–1992 regulation's "promptness" requirement was vague and subject to varying interpretations; hence, the Union has not countered the Secretary's contention that the more specific requirement in § 75.360(f) provides at least equivalent protection to miners. The Secretary observed in the preamble to the 1996 rule that "[t]he term "promptly" involves ambiguity that is eliminated by specifying the time for countersigning the preshift examination record. The rulemaking record does not show that the time set by the final rule would expose miners to safety or health risks." 61 Fed.Reg. 9797. In proposing the language at issue in 1994, the Secretary made clear that:

> no change was intended by the Agency … Allowing until the end of the mine foreman's next regularly scheduled working shift to countersign the report would assure that the mine foreman is aware of the results of all preshift examinations and can implement necessary corrective actions in a timely manner.

59 Fed.Reg. 26,375.

The Secretary's determination that the time frame established for countersigning in § 75.360(f) provides no less protection than the "promptness" test it replaced is entitled to deference. Therefore, even though the Secretary may have taken practical concerns into account in promulgating § 75.360(f), *see* 61 Fed.Reg. 9797, the Union fails to undercut the Secretary's explanation of why the more specific rule set forth in § 75.360(f) will provide no less protection than the prior ambiguous standard.

### K. *30 C.F.R. § 75.363(a)—Posting of Hazards Discovered During Preshift Examinations*

The Union contends that 30 C.F.R. § 75.363(a) (1996) eliminates the requirement of the prior rule that when a certified mine examiner locates a hazardous condition during a preshift examination, "he shall indicate such hazardous place by posting a 'danger' sign conspicuously at all points which persons entering such hazardous place would be required to pass, and shall notify the operator of the mine." 30 C.F.R. § 75.303(a) (1991). Because § 75.363(a) contains the same posting requirement as the previous regulation, the Union's claim is meritless. Section 75.363(a) requires that "[a]ny hazardous condition found by the mine foreman or equivalent mine official, assistant mine foreman or equivalent mine official, or other certified persons designated by the operator for the purposes of conducting examinations … shall be posted with a conspicuous danger sign where anyone entering the areas would pass." Under the regulations, the preshift examiner is a "certified person designated by the operator under … subpart D." *See* 30 C.F.R. § 75.360 (1996). Moreover, in May 1996, the Secretary published a correction notice in the Federal Register that revised § 75.363(a) to include the following sentence: "A hazardous condition shall be corrected immediately or the areas shall remain posted until the hazardous condition is corrected." 61 Fed.Reg. 26,442. Thus, under the regulation, when a preshift examiner locates a hazardous condition the examiner is required to correct the condition immediately or to post warnings of the hazard.

### L. *30 C.F.R. §§ 75.360, 75.361, 75.363, and 75.364—Deletion of Second-level Countersigning*

■ Under the 1996 rules, certain results of preshift and weekly examinations, as well as hazardous conditions found by a certified person, must be recorded.[25] The re-

provides less protection in effect than the prior regulation.

**25.** Section 75.360(f) requires, in relevant part:

> A record of the results of each preshift examination, including a record of hazardous conditions and their locations found by the examiner during each examination and of the results and locations of air and methane measurements, shall be made on the surface before any per-

sons … enter any underground area of the mine … The record shall be made by the certified person who made the examination or by a person designated by the operator. If the record is made by someone other than the examiner, the examiner shall verify the record by initials and date by or at the end of the shift for which the examination was made. A record shall also be made by a certified person of the action taken to correct hazardous conditions found during the preshift examination.

cording requirements in § 75.363(b) and (c), insofar as they apply to discovery of hazardous conditions, also apply to supplemental examinations conducted pursuant to § 75.361.[26] Under the prior regulation, however, mine superintendents were obligated to countersign reports.[27] The Union contends that because the 1996 regulations no longer require second-level countersigning by the mine superintendent or assistant superintendent after the mine foreman has countersigned, they result in a reduction in protection from the pre–1992 rule. Specifically, the Union maintains that "[r]elaxing recording requirements discourages mine operators from providing safe conditions in the mine," that "[l]imiting the amount of information recorded in examination reports limits the investigative abilities of [mine managers and federal investigators]," and that "stunting investigations discourages corrective action as mine operators ignore examination reports."

> All preshift and corrective action records shall be countersigned by the mine foreman or equivalent mine official by the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift.
> 30 C.F.R. § 75.360(f) (1996).
> Similarly, § 75.363(b), applicable to hazardous conditions, provides in relevant part:
> A record shall be made of any hazardous condition found ... The record shall be made by the completion of the shift on which the hazardous condition is found and shall include the nature and location of the hazardous condition and the corrective action taken.
> 30 C.F.R. § 75.363(b) (1996). Section 75.363(c) provides:
>> The record shall be made by the certified person who conducted the examination or a person designated by the operator. If made by a person other than the certified person, the certified person shall verify the record by initials and date by or at the end of the shift for which the examination was made. Records shall be countersigned by the mine foreman or equivalent mine official by the end of the mine foreman's or equivalent mine official's next regularly scheduled shift.
> 30 C.F.R. § 75.363(c) (1996).
> In addition, § 75.364(h), applicable to required weekly examinations, provides in relevant part:
>> At the completion of any shift during which a portion of a weekly examination is conducted, a record of the results of each weekly examination, including a record of hazardous conditions found during each examination and their locations, the corrective actions taken, and the results and location of air and methane mea-

The Secretary relies on MSHA's determination that second-level countersigning serves no safety purpose. In deleting the countersigning requirement in the 1992 rule, the Secretary explained that "[i]n many instances, the mine superintendent is not a certified person and the mine foreman is held ultimately responsible for the operation of the mine by many state laws." 57 Fed.Reg. 20,895. Similarly, in the preamble to the 1996 rule, the Secretary stated:

> MSHA has determined that countersigning by the mine foreman or equivalent mine official ... provides the means necessary to detect and correct developing hazards in a mine. Countersigning by the mine foreman assures the necessary notification to an official with the knowledge of the day-to-day operation of the mine having the authority to maintain the mine in a safe operating condition. Agency experience has demonstrated that higher level mine

> surements, shall be made ... The record shall be made by the person making the examination or a person designated by the operator. If made by a person other than the examiner, the examiner shall verify the record by the initials and date by or at the end of the shift for which the examination was made. The record shall be countersigned by the mine foreman or equivalent mine official by the end of the mine foreman's or equivalent mine officials's next regularly scheduled working shift.
> 30 C.F.R. § 75.364(h) (1996).

26. Section § 75.361 applies to supplemental examinations, which must be conducted "within 3 hours before anyone enters an area in which a preshift examination has not been made for that shift...." 30 C.F.R. § 75.361(a) (1996). For all supplemental examinations, "a certified person shall examine the area for hazardous conditions, determine whether the air is traveling in its proper direction and at its normal volume, and test for methane and oxygen deficiency." *Id.* Section 75.361(b) further provides that, for all working places examined, "the person making the supplemental examination shall certify by initials, date, and the time, that the examination was made."

27. 30 C.F.R. § 75.323 provided in relevant part:

> The mine foreman shall read and countersign promptly the daily reports of the preshift examiner and assistant mine foreman, and he shall read and countersign promptly the weekly report covering the examinations for hazardous conditions ... The mine superintendent or assistant superintendent of the mine shall also

---

officials commonly lack hands-on involvement or in-depth knowledge of the specific conditions underground or how the highly detailed ventilation rules impact upon those conditions. Therefore, countersigning by a mine official at a higher level does not assure *any* additional level of safety and imposes an unnecessary burden.

61 Fed.Reg. 9767. Thus, the Secretary has provided a reasoned explanation for concluding that the regulation's placement of the countersigning responsibility on the mine foreman, the person with responsibility for maintaining safety in the mine, rather than spreading responsibility between two levels of management, will not cause a reduction in safety.

▇ Similarly, the Union's challenges to the recording requirements concerning § 75.362 (on-shift examinations) and § 75.363(c) (discovery of hazardous conditions) under the no-less protection rule fail. In the pre–1992 rule, there were no recording or countersigning requirements specifically associated with hazardous conditions or with on-shift examinations. *See* 30 C.F.R. §§ 75.304, 75.323 (1991). In addition, 30 U.S.C. § 863(v)'s secondary countersigning requirement does not apply specifically to on-shift examinations or to hazardous conditions. Under the 1996 rule, however, hazardous conditions found during the on-shift examination must be recorded and countersigned by the mine foreman pursuant to § 75.363(b) & (c). Hence, § 75.363, which requires both recording and countersigning

for hazardous conditions, and § 75.362, which also requires recording where hazardous conditions are found during on-shift examinations, increases protection over the pre–1992 rule.

## M. 30 C.F.R. § 75.334(f)—Bleederless Gobs

Section 75.334 addresses the problem of worked out areas of a mine or "gobs," in which "bleeder systems" are normally employed to "allow the methane in areas where mining has already occurred (mined out areas) to be ventilated out of the mine so as to prevent dangerous levels of methane from accumulating." [28] The Secretary recognized that "in some mines the practice of ventilating worked-out areas increases the risk of spontaneous combustion by supplying oxygen to combustion-prone materials in these areas." 61 Fed.Reg. 9785. Thus, under § 75.334(f), the requirements of subsections (a) and (b) are to be replaced in "mines with a demonstrated history of spontaneous combustion, or that are located in a coal seam determined to be susceptible to spontaneous combustion" with specified measures that must be included in an "approved ventilation plan." [29] The Union contends that prior to 1992, all gobs were required to have bleeders unless the mine operator was granted a modification of the standard pursuant to § 101(c) of the Mine Act, *see* 30 U.S.C. § 811(c), and that the "allowance of the use of bleederless gobs through the ventilation plan process will lessen safety in the mines." The Union maintains that "[u]se of bleederless gobs,

---

read and countersign the daily and weekly reports of such persons.
30 C.F.R. § 75.323 (1991).

**28.** Section 75.334 provides in relevant part:
(a) Worked-out areas where no pillars have been recovered shall be—
(1) Ventilated so that methane-air mixtures and other gases, dusts, and fumes from throughout the worked-out areas are continuously diluted and routed into a return air course or to the surface of the mine; or
(2) Sealed.
(b)(1) During pillar recovery a bleeder system shall be used to control the air passing through the area and to continuously dilute and move methane-air mixtures and other gases, dusts, and fumes from the worked-out area away from active workings and into a return air course or to the surface of the mine.

(2) After pillar recovery a bleeder system shall be maintained to provide ventilation to the worked-out area, or the area shall be sealed.
30 C.F.R. § 75.334 (1996).

**29.** Under § 75.334(f), the mine ventilation plan must include:
(1) Measures to detect methane, carbon monoxide, and oxygen concentrations during and after pillar recovery, and in worked-out areas where no pillars have been recovered, to determine if the areas must be ventilated or sealed.
(2) Actions that will be taken to protect miners from the hazards of spontaneous combustion.
(3) If a bleeder system will not be used, the methods that will be used to control spontaneous combustion, accumulations of methane-air mixtures, and other gases, dusts, and fumes in the worked-out area.
30 C.F.R. § 75.334(f) (1996).

which should be sparing, could be more prevalent than if an operator were required to go through the petition for modification process" because "the showing an operator must make to obtain approval, 'a demonstrated history of spontaneous combustion' is not precise enough to erect any meaningful limit to their use."

For several reasons, the Union's challenge to § 334(f) fails. First, the Secretary points out that the applicable pre–1992 regulation, 30 C.F.R. § 75.316–2(e) (1991), in essence provided the same ability to substitute bleeders with alternative measures.[30] Thus, under these criteria, the Secretary could properly approve bleederless gobs in ventilation plans as "equivalent means." Second, the Union's contention that use of bleederless gobs could be more prevalent under the new ventilation approval process is speculative, and any deviation from the use of bleeders presumably would receive individualized scrutiny because the Secretary approves ventilation plans on a mine-by-mine basis. *See* 61 Fed.Reg. 9785. Third, miners' representatives are afforded the opportunity to participate in the development of the mine ventilation plan, *see* 30 C.F.R. § 75.370(a)(3) (1996), and the Union fails to demonstrate that, despite providing miners an opportunity to influence ventilation plans, the new regulation provides less protection than the previous regime. *See* 30 U.S.C. § 811(c).

Finally, the Union's contention that the "demonstrated history of spontaneous com-

bustion" criterion, 30 C.F.R. § 75.334(f), is "not precise enough," is unpersuasive. As the Secretary states, the same criterion would need to be applied even if a modification procedure were utilized instead of the ventilation plan approval process. In any event, the language of the regulation is sufficiently clear to provide adequate notice to operators of the regulation's requirements. *See Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm.,* 108 F.3d 358, 360 (D.C.Cir.1997).

## N. *30 C.F.R. §§ 75.360, 75.362—Examinations of Belt Conveyors*

Section 75.360(b)(2) requires that preshift examinations must include a check of proper airflow at "[b]elt conveyors that will be used to transport persons during the oncoming shift and the entries in which these belt conveyors are located."[31] There is no merit to the Union's two contentions that, first, because the pre–1992 regulations required two examinations, one preshift and one on-shift, the ability of the operator under the new regime to fulfill the requirements by conducting only one examination reduces safety; and second, "since the preshift examination of the belt conveyer must be performed no more than three hours before the start of a shift, there will be at least five hours at the beginning of the next shift during which the belt conveyers will have gone unexamined." There is no difference between the pre–1992 regulation [32] and the new

30. Section 75.316–2(e) was included among the criteria by which district managers were to be guided in approving ventilation plans, and provided in relevant part:

Bleeder entries, bleeder systems, *or equivalent means* should be used in all active pillaring areas to ventilate the mined areas from which the pillars have been wholly or partially extracted, so as to control the methane content in such areas.

30 C.F.R. § 75.316–2(e) (1991) (emphasis added).

31. Section 75.362(b) also requires, in relevant part, that on-shift examinations be conducted as follows:

During each shift that coal is produced, a certified person shall examine for hazardous conditions along each belt conveyor haulageway where a belt conveyor is operated. This examination may be conducted at the same

time as the preshift examination of belt conveyors and belt conveyor haulageways, if the examination is conducted within 3 hours before the oncoming shift.

30 C.F.R. § 75.362(b) (1996).

32. For preshift examinations, the prior regulation, § 75.303(a) required in relevant part:

Within 3 hours immediately preceding the beginning of any shift, and before any miner in such shift enters the active workings of a coal mine, certified persons designated by the operators of the mine shall examine such workings and any other underground area of the mine designated by the Secretary or his authorized representative. Each such examiner shall examine ... belt conveyors on which men are carried....

30 C.F.R. § 75.303(a) (1991). As to on-shift examinations, the regulation required that "[b]elt conveyors on which coal is carried shall be ex-

regulations. Section 75.362(b) of the new rule provides that if an examination of belt conveyors is conducted during the three hours immediately preceding the subsequent shift, it may serve as both the on-shift examination for the current shift and the preshift examination for the subsequent shift. The Union implicitly reads a time criterion into the pre–1992 regulation's requirement that belt conveyors were to be examined "after each coal-producing shift had begun." Yet nothing in the language of § 75.303(a) prevented management from conducting the on-shift examination at any time after the shift had begun, including during its last three hours.

### O. *Remaining Challenges—Arbitrary and Capricious Failures to Regulate*

The Union's remaining challenges to the rulemaking claim that the Secretary acted in an arbitrary and capricious manner in failing to impose certain health and safety requirements in the mines. These remaining claims are not brought under the no-less protection rule because the standards proposed by the Union would not replace existing requirements. The Court reviews only to ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2866.

■ Of these claims, the only item we find to be worthy of discussion is the Union's challenge to 30 C.F.R. § 75.380 regarding escapeways. The Union argues that the agency acted arbitrarily and capriciously in failing to adopt three proposed escapeway standards: 1) that each escapeway contain clear markings and lifelines; 2) that locations in escapeways be identified by number; and 3) that regulations identify one escapeway as "smokefree." The agency's only response to the proposals was to say, in its general discussion of the rulemaking, that "MSHA has also received comments on a number of other issues that are outside the scope of this rulemaking.... The final rule, therefore, does not include these recommendations." 61 Fed.Reg. 9765.

■ We hold that the agency did not act arbitrarily and capriciously simply by failing to adopt the Union's recommendations. As we have stated,

> An agency does not have to "make progress on every front before it can make progress on any front." Agencies often must contend with matters of degree. Regulations, in other words, are not arbitrary just because they fail to regulate everything that could be thought to pose any sort of problem.

*Personal Watercraft Industry Ass'n v. Dept. of Commerce*, 48 F.3d 540, 544 (D.C.Cir.1995) (citations omitted). The agency is, however, required to respond to comments that are "relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule [because they] cast doubt on the reasonableness of a position taken by the agency." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n. 58; *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). This requirement is not "particularly demanding." *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (1993). Courts " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,' " *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Bowman Transp. Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). Here, the agency did not specifically address its reasons for declining to adopt the escapeway provisions recommended by the Union and stated only that the provisions were "beyond the scope of the rulemaking." We take this to mean that the agency was choosing to impose some standards without addressing "everything that could be thought to pose any sort of problem." *Personal Watercraft*, 48 F.3d at 544. We find that this explanation was adequate and that the agency did not act arbitrarily or capriciously with respect to the proposed escapeway standards. We reject, without discussion, the remainder of the Union's arbitrary and capricious challenges.

### IV. Conclusion

For the foregoing reasons, we grant the petition for review on petitioner's challenge

---

amined after each coal-producing shift has be-

gun." *Id.*

to Section 75.360 relating to preshift examinations. On all other issues we deny the petitions for review.

*So ordered.*