# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 12, 2019          Decided June 11, 2019

No. 18-1116

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION,
AFL-CIO-CLC AND UNITED MINE WORKERS OF AMERICA
INTERNATIONAL UNION,
PETITIONERS

v.

MINE SAFETY AND HEALTH ADMINISTRATION AND
R. ALEXANDER ACOSTA, SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,
RESPONDENTS

———

On Petition for Review of a Final Rule of
the Mine Safety & Health Administration

———

*Laura Karr* argued the cause for the petitioner United Mine Workers. *Susan J. Eckert* argued the cause for the petitioner United Steelworkers. *Joseph M. Santarella, Jr.* and *Andrew D. Roth* were with them on brief.

*Emily Toler Scott*, Attorney, Mine Safety & Health Administration, argued the cause for the respondents. *Ali A. Beydoun*, Counsel, Appellate Litigation, was with her on brief.

Before: HENDERSON, ROGERS and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KATSAS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Mine Safety and Health Administration (MSHA), housed in the United States Department of Labor (Labor), sets health and safety standards for mine operations. Its regulatory authority is subject to a unique limitation: "[n]o mandatory health or safety standard . . . shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). The no-less-protection standard occupies center stage in the case before us. In 2017, MSHA promulgated a safety standard that requires mine operators to examine all areas before miners begin work and to record all "conditions that may adversely affect safety or health" discovered during the examination. *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. 7680, 7682 (Jan. 23, 2017) (2017 Standard). Fourteen months later, however, MSHA amended the requirements, allowing examinations to occur before or as miners begin work and allowing mine operators to exclude from their records adverse conditions that are promptly corrected. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. 15,055 (Apr. 9, 2018) (codified at 30 C.F.R. §§ 56.18002(a)–(c), 57.18002(a)–(c)) (2018 Amendment). We are called upon to decide whether MSHA explained adequately how the amendments to the 2017 Standard comply with the no-less-protection standard.

## I. BACKGROUND

The Federal Mine Safety and Health Act of 1977, Pub. L. No. 91-173, 83 Stat. 742 (codified as amended at 30 U.S.C. §§ 801 *et seq.*) (Mine Act), directs the Labor Secretary to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). The Secretary discharges his Mine Act responsibilities through MSHA. The Mine Act includes a no-less-protection standard, which provides that "[n]o mandatory health or safety standard . . . shall reduce the protection afforded miners by an existing mandatory health or safety standard." *Id.* § 811(a)(9). This unusual limitation "expressly mandates that no reductions in the level of safety below existing levels be permitted, regardless of the benefits accruing to improved efficiency." *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 666 (D.C. Cir. 1989).

MSHA has for decades required examinations of mine workplaces and imposed recordkeeping requirements on mine operators. From 1979 to 2017, MSHA required "[a] competent person designated by the operator" to "examine each working place at least once each shift for conditions which may adversely affect safety or health." 30 C.F.R. § 56.18-2(a) (1980); *see also id.* § 57.18-2(a) (same requirements for underground mines). The examination could occur anytime during the shift. *Id.* The standard also mandated that operators keep "[a] record that [] examinations were conducted." *Id.* § 56.18-2(b); *see also id.* § 57.18-2(b) (underground mines).

In 2017, MSHA decided to impose more stringent requirements. *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. at 7680–81. It adopted a new

standard for workplace examinations: "[a] competent person designated by the operator shall examine each working place at least once each shift *before miners begin work* in that place, for conditions that may adversely affect safety or health." 30 C.F.R. § 56.18002(a) (2017) (emphasis added) (2017 Standard); *see also id.* § 57.18002(a) (underground mines). It also added more detailed recordkeeping requirements, demanding for the first time that a record of an examination include (as relevant here): a "description of each condition found that may adversely affect the safety or health of miners." *Id.* § 56.18002(b); *see also id.* § 57.18002(b) (underground mines). The 2017 Standard was originally slated to take effect on May 23, 2017. MSHA twice delayed the effective date. *See Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. 15,173 (March 27, 2017); *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. 23,139 (May 22, 2017). After a three-day period of effectiveness in October 2017, MSHA temporarily withdrew the 2017 Standard and delayed its effective date for a third time. *See Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. 46,411 (Oct. 5, 2017).

In April 2018, MSHA promulgated a final rule amending the requirements of the 2017 Standard. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,055 (2018 Amendment). Under the 2018 Amendment, a competent person must "examine each working place at least once each shift before work begins *or as miners begin work in that place*[] for conditions that may adversely affect safety or health." 30 C.F.R. § 56.18002(a) (emphasis added); *see also id.* § 57.18002(a) (underground mines). Unlike the 2017 Standard, then, the 2018 Amendment gives mine operators the option to conduct examinations as miners begin work in an area. *Id.* The 2018 Amendment also modifies the recordkeeping requirement to mandate that a "record shall

contain the . . . description of each condition found that may adversely affect the safety or health of miners *and is not corrected promptly*." *Id.* § 56.18002(b) (emphasis added); *see also id.* § 57.18002(b) (underground mines). The new language allows a mine operator to omit from its records promptly corrected adverse conditions. *Id.* The 2018 Amendment went into effect on June 2, 2018.

Petitioners the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC, and the United Mine Workers of America International Union filed a timely petition for review of the 2018 Amendment. They claim that the 2018 Amendment violates both the Mine Act's no-less-protection standard, 30 U.S.C. § 811(a)(9), and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

## II. ANALYSIS

The Mine Act requires MSHA to "state the basis for its conclusion" that a new health or safety standard satisfies the no-less-protection standard. *Nat'l Min. Ass'n v. MSHA*, 116 F.3d 520, 536 (D.C. Cir. 1997) (per curiam) (no-less-protection standard "requires the agency to state the basis for its conclusion that the [standard] has been satisfied"). The statement is subject to review under the Administrative Procedure Act and must manifest that MSHA engaged in reasoned decisionmaking. *See id.*; *see also Rosebud Mining Co. & Parkwood Res., Inc. v. MSHA*, 827 F.3d 1090, 1101 (D.C. Cir. 2016) (MSHA action reviewed under Administrative Procedure Act). Our review "is, as always, 'highly deferential and presumes the validity of agency action.'" *Nat'l Min. Ass'n*, 116 F.3d at 536 (quoting *Dole*, 870 F.2d at 666).

## A.  EXAMINATION REQUIREMENT

The petitioners first claim that MSHA failed to explain adequately how the 2018 Amendment's examination requirement complies with the no-less-protection standard. As noted, the 2017 Standard required examinations to occur *before* miners begin work in an area.  30 C.F.R. § 56.18002(a) (2017); *see also id.* § 57.18002(a).  By contrast, the 2018 Amendment "allows miners to enter a working place at the same time a competent person examines for adverse conditions." *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,058.  On its face, this change appears to increase miners' exposure to health and safety risks.  As the Labor Secretary has observed, a careful person does not check the sturdiness of his ladder after climbing half the rungs nor does a careful mine operator check the safety of an area while allowing miners to work there.  *See* Secretary of Labor's Response Brief at 18–19, *Nat'l Mining Ass'n et al. v. MSHA*, No. 17-11207 (11th Cir. July 19, 2017) (invoking ladder analogy for mine safety argument).  Even so, MSHA claims the no-less-protection standard is satisfied because under the 2018 Amendment, as under the 2017 Standard, adverse conditions will be "identified and miner notification provided before miners are potentially exposed to the conditions."[1] *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,058.

---

[1] MSHA contends on brief to us that the new examination requirement creates additional safety benefits by reducing "the risk that, between the time of the examination and the time miners begin work, conditions will have changed and created new or different hazards."  The contention does not appear in the administrative record and so we do not consider it.  *See PG&E Gas Transmission, Nw. Corp. v. FERC*, 315 F.3d 383, 388 (D.C. Cir. 2003) ("[T]his Court cannot consider . . . *post hoc* justifications" and "may only

The problem with this explanation is that the 2018 Amendment does not allow for notification *before* exposure. Its notification provisions state: "[t]he operator shall promptly notify miners in any affected areas of any conditions found that may adversely affect safety or health" and "[c]onditions noted by the person conducting the examination that may present an imminent danger shall be brought to the immediate attention of the operator." 30 C.F.R. § 56.18002(a)(1)–(2). These provisions require notification as soon as an adverse condition is discovered. *Id.* Nowhere do they require notification *before miners are exposed*. *See id*. Because the 2018 Amendment allows miners to work in an area before the examination is completed, there is the likelihood that miners may be exposed to an adverse condition before it is discovered. *Id.* § 56.18002(a) ("A competent person . . . shall examine each working place at least once each shift before work begins or as miners begin work in that place."). MSHA's attempt to explain how the examination requirement complies with the no-less-protection standard relies on a non-existent notification-before-exposure duty and is therefore arbitrary and capricious.[2] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

---

consider the grounds on which the [agency] actually relied in making its decision.").

[2] It is no answer to say, as MSHA does, that the preamble to the 2018 Amendment expresses MSHA's intention that miners receive notification before being exposed to adverse conditions. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,058 ("MSHA intends for adverse conditions to be identified and miner notification provided before miners are potentially exposed to the conditions."). Mine operators must comply with the notification requirements of the 2018 Amendment, not MSHA's statements "from the preamble, which itself lacks the force and effect of law." *See Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018).

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (action is arbitrary and capricious "if the agency has . . . offered an explanation . . . so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

The explanation is arbitrary and capricious for a second reason: it cannot be reconciled with factual findings that MSHA made in support of the 2017 Standard. An agency is generally free to change positions so long as it can "show that there are good reasons for the new policy," not "that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This flexibility has limits. If the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy." *Id.* at 515–16. In promulgating the 2017 Standard, MSHA found that "[i]f the examination is performed after miners begin work, miners may be exposed to conditions that may adversely affect their safety and health." *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. at 7689. For that reason, MSHA explained, the 2017 Standard "requires that a competent person conduct an examination before work begins so that conditions that may adversely affect miners' safety and health are identified before they begin work and *are potentially exposed*." *Id.* at 7683 (emphasis added). MSHA took a new contrary-to-fact position in the 2018 Amendment: miners can begin work before the required examination is completed without being exposed to adverse conditions. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,058. It gave no explanation for the change.

There is another unexplained departure. From 1979 to 2017, MSHA's safety standard allowed operators to conduct an

examination anytime during a shift. *See* 30 C.F.R. § 56.18-2(a) (1980); *see also id.* § 57.18-2(a) (underground mines). This flexibility, in MSHA's "experience," created "a significant degree of variability in how safety programs are operationalized." *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. at 7689. MSHA introduced the 2017 Standard, in part, to "reduce the variability in how operators conduct examinations of working places and thereby improve miners' safety and health." *Id.* The 2018 Amendment reintroduced that very same variability by allowing examinations to occur before or while miners begin work. *E.g.*, 30 C.F.R. § 56.18002(a). Despite citing increased flexibility as a boon for mine operators, MSHA completely ignored its previous finding that increased flexibility (read: variability) does not improve miner safety. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,058. For these reasons, we agree with the petitioners that MSHA has failed to explain adequately how the 2018 Amendment's examination requirement complies with the statutory no-less-protection standard.

## B. RECORDKEEPING REQUIREMENT

The petitioners next argue that MSHA failed to provide a reasoned explanation why the recordkeeping requirement of the 2018 Amendment satisfies the no-less-protection standard. In the preamble to the 2017 Standard, MSHA determined that "recording *all adverse conditions, even those that are corrected immediately*, will be useful as a means of identifying trends," which "should help inform mine management regarding areas or subjects that may benefit from increased safety emphasis." *See Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. at 7686 (emphasis added). MSHA acknowledged this determination in the preamble to the 2018 Amendment. *Examinations of Working*

*Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,059. It nonetheless concluded that "a recording exception for adverse conditions that are corrected promptly," like the one created by the 2018 Amendment, "will yield as much or more in safety benefits, because it encourages prompt correction of adverse conditions." *Id.*

MSHA's unsupported explanation does not withstand scrutiny. An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). MSHA recognized that the recordkeeping requirements of both the 2017 Standard and the 2018 Amendment provide safety benefits. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,059. Under the no-less-protection standard, then, MSHA's burden was to explain why the benefits of the 2018 Amendment equal or exceed those of the 2017 Standard. *See* 30 U.S.C. § 811(a)(9). MSHA instead declared, without further elaboration, that the 2018 Amendment "will yield as much or more in safety benefits, because it encourages prompt correction of adverse conditions." *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,059. This reasoning—the 2018 Amendment will yield better safety protection by incentivizing mine operators to promptly correct adverse conditions—is, at best, specious. The 2017 Standard already requires mine operators to "promptly initiate appropriate action to correct [adverse] conditions." 30 C.F.R. §§ 56.18002(a)(1), 57.18002(a)(1). MSHA cannot, without explanation, justify the 2018 Amendment on the basis that it will encourage mine operators to follow safety measures *already required by law* in the very same regulation. Moreover, MSHA has offered no basis for its conclusion that

those supposed benefits will *equal or exceed* those yielded by the 2017 Standard. Because the record lacks a reasonable justification for the recordkeeping requirement's supposed safety benefits and any comparative analysis whatsoever, MSHA's explanation is arbitrary and capricious. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do" under arbitrary and capriciousness standard).[3]

---

[3] MSHA's brief makes two additional arguments in support of the recordkeeping requirement. It "reduces the risk of inundating miners with information" and is "narrow" enough to lack safety implications. But these arguments do not appear in the administrative record and thus we do not consider them. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

Our dissenting colleague believes MSHA's preamble statement about "overwhelm[ing] the record with minor housekeeping issues" counts as expressing concern about "inundating miners with information." Dissent at 7–8. We see no basis for concluding that MSHA meant something other than what it said, especially considering (1) the statement about "overwhelm[ing] the record" appears in a paragraph regarding mine *operator* burdens, *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,059, and (2) mine operators, not miners, maintain the examination records, 30 C.F.R. § 56.18002(d) ("The operator shall maintain the examination records for at least one year . . . ."). Insofar as commenters raised a concern regarding the safety implications of "cluttering the examination record," Dissent at 8 (citing J.A. 769, 911), MSHA never adopted that concern as its own, despite going out of its way to *expressly* adopt others. *See Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,059.

The dissent would uphold MSHA's conclusory explanation and repeatedly takes us to task for not affording MSHA enough deference. Dissent at 3–8. The dissent locates its deference principle in *National Mining Association v. MSHA*, 116 F.3d 520 (D.C. Cir. 1997) (per curiam), a case in which we rejected no-less-protection standard challenges to an MSHA safety standard, *id.* at 535–49. Importantly, however, the petitioners there challenged MSHA's *factual determinations* that the new standard provided miners with as much protection as the old standard. *E.g.*, *id.* at 542 ("The Union's remaining challenges under the no-less protection rule require only brief comment because they too involve challenges to the Secretary' net effects *determinations* that the new regulation *will not diminish the level of safety* for miners that existed under the prior regulations." (emphases added)). Applying "well-established principles of deference to agency action," *id.* at 536, we rejected the challenges because "we are required to defer to the agency on factual determinations underlying its decision," including a net safety effects determination, *id.* at 537. A deference standard for "factual determinations" has little to do with the arbitrary and capriciousness challenge before us.

In addition, the dissent claims that, because MSHA's thin explanation for its compliance with the no-less-protection standard in *National Mining Association* survived judicial review, MSHA's even thinner explanation here must do so as well. Dissent at 4–5. Our colleague overlooks two crucial points. *First*, the *National Mining Association* petitioners did not *challenge* the adequacy of MSHA's explanation for its compliance with the no-less-protection standard and therefore we did not decide whether that explanation would survive arbitrary and capriciousness review. *See Nat'l Mining Ass'n*, 116 F.3d at 535–49. Any inferences the dissent divines from *National Mining Association* regarding this issue are therefore

dicta. *Second*, *National Mining Association* upheld many aspects of the challenged regulation, including those recited by the dissent, *see* Dissent at 4–5, based on the petitioners' failure to provide evidence contradicting MSHA's findings or persuasive reasons for doubting its determinations. *See, e.g.*, *Nat'l Mining Ass'n*, 116 F.3d at 539 ("The Union does not offer any evidence to dispute the Secretary's position."); *id.* at 542 ("The Union has pointed to no reason to conclude that the Secretary's determination . . . is outweighed . . . ."); *id.* at 543 (finding "unpersuasive the Union's contention that the new regulation removes [] incentive[s] . . . ."). Here, by contrast, MSHA had to contend with its own previous findings in promulgating the 2017 Standard that requiring mine operators to record all adverse conditions, including those that are immediately corrected, helps "expedite[] the correction of these conditions" and "identify[] trends" and "areas or subjects that may benefit from increased safety emphasis." *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. at 7686. Thus, an explanation that might have sufficed in *National Mining Association* with MSHA writing on a blank slate is inapplicable here with MSHA's 2017 findings already on the books.

In sum, MSHA failed to offer a reasoned explanation why the examination and recordkeeping requirements of the 2018 Amendment satisfy the no-less-protection standard. The 2018 Amendment is therefore *ultra vires* and unenforceable. *See* 5 U.S.C. § 706(2)(A). The ordinary practice is to vacate unlawful agency action. *See id.* § 706(2) ("The reviewing court shall . . . set aside agency action . . . found to be" unlawful). In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors. MSHA asks us to do so here. The appropriateness of the remand-without-vacatur remedy turns on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely

it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (internal quotation marks, brackets, and ellipses omitted) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048–49 (D.C. Cir. 2002)).  MSHA explains neither how the 2018 Amendment can be saved nor how vacatur will cause disruption.  We therefore take the normal course and vacate the 2018 Amendment.[4]

The complicated procedural history of this case raises a question about what standard governs after vacatur.  *See supra* at 4.  We agree with the parties that vacatur of the 2018 Amendment *automatically* resurrects the 2017 Standard.  The 2018 Amendment modifies the terms of the 2017 Standard and so vacatur of the 2018 Amendment simply undoes those modifications.  *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. at 15,056 (2018 Amendment "makes changes to" Code of Federal Regulations provisions "as amended by the Agency's final rule on examinations of working places that was published on January 23, 2017").  To avoid any confusion, we order MSHA to reinstate the 2017 Standard upon issuance of the mandate attendant on this opinion.

For the foregoing reasons, we vacate the 2018 Amendment and order the 2017 Standard reinstated.

*So ordered*.

---

[4] Because we vacate the 2018 Amendment based on MSHA's failure to explain adequately its compliance with the no-less-protection standard, we need not—and hence do not—consider the petitioners' remaining APA and Mine Act arguments.

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: The Mine Safety and Health Administration promulgated a regulation requiring mine operators to (1) "examine each working place at least once each shift before miners begin work in that place" and (2) prepare a "record" describing "each condition found that may adversely affect the safety or health of miners." *Examinations of Working Places in Metal and Nonmetal Mines*, 82 Fed. Reg. 7680, 7695 (Jan. 23, 2017) (*Mine Examinations I*). After further review, MSHA amended the regulation in two respects. *Examinations of Working Places in Metal and Nonmetal Mines*, 83 Fed. Reg. 15,055, 15,057–58 (Apr. 9, 2018) (*Mine Examinations II*). Operators now may conduct the examination "before work begins or as miners begin work," 30 C.F.R. § 56.18002(a)(1), and the recording requirement now applies only to adverse conditions that are "not corrected promptly," *id.* § 56.18002(b). I believe that MSHA adequately explained the second change but not the first.

The Federal Mine Safety and Health Act of 1977 contains what has been described as a no-less-protection rule: "No mandatory health or safety standard promulgated under this subchapter shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). When amending safety regulations, MSHA must "state the basis for its conclusion that the rule has been satisfied." *Nat'l Mining Ass'n v. MSHA*, 116 F.3d 520, 536 (D.C. Cir. 1997) (per curiam). Our review of this determination is "highly deferential and presumes the validity of agency action." *Id.* (quotation marks omitted). So, we do not lightly reject MSHA's evaluation of the "net safety effects of a change in a regulation," *id.* at 542, or the "factual determinations underlying its decision," *id.* at 537.

I agree with my colleagues that, even under this deferential standard of review, MSHA failed to justify the amendment to

the examination requirement. MSHA asserted that miners "will be notified" of adverse conditions "before they are potentially exposed," regardless of whether the examination is conducted before or as they begin work. *Mine Examinations II*, 83 Fed. Reg. at 15,058. But the regulation itself requires only that operators "promptly notify" miners of adverse "conditions found." 30 C.F.R. § 56.18002(a)(1). It does not guarantee that such conditions will be found before exposure— which hardly seems inevitable if the examination is conducted as miners begin work rather than before. Because MSHA did not explain how miners would be notified of hazards before exposure, its decision was arbitrary and capricious.

In this Court, MSHA advanced more developed and more plausible justifications for the amendment. Perhaps it would be safe to conduct the examination as work begins, if the inspector is always "just ahead" of the miners and warns them of hazards "in real time." Respondents' Br. at 14. Perhaps this would even improve safety, by minimizing "the risk that conditions will be so changed" between the examination and the beginning of work. *Id.* at 12. But MSHA did not assert these justifications during the 2018 rulemaking. True, it noted that mines have "dynamic work environments where conditions are always changing." *Mine Examinations II*, 83 Fed. Reg. at 15,057. But it did so only to urge a "best practice" of conducting examinations "throughout the shift," not to suggest that examinations conducted as work begins are as safe or safer than ones conducted before. *See id.* Of course, we cannot uphold the amendment based on rationales that MSHA first articulated in litigation, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983), but the agency remains free to consider them on remand.

Unlike my colleagues, I would uphold the amendment limiting the recording requirement to hazards that are not

promptly corrected. MSHA's analysis of this amendment balanced three competing safety considerations. First, MSHA recognized that "recording all adverse conditions, even those that are corrected promptly, would be useful in identifying trends and areas that could benefit from an increased safety emphasis." *Mine Examinations II*, 83 Fed. Reg. at 15,059. But MSHA then identified two countervailing considerations. It reasoned that "a recording exception for adverse conditions that are corrected promptly … encourages prompt correction of adverse conditions." *Id.* And it concluded that "requiring all adverse conditions [to] be recorded in the examination record would overwhelm the record with minor housekeeping issues." *Id.* The latter considerations are reasonable. Encouraging prompt correction of hazards would seem to have obvious safety benefits. Moreover, this Court has noted the risk of "information overload," *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1277 (D.C. Cir. 1988) (quotation marks omitted), and other federal agencies have acted to prevent it, *see, e.g.*, *Truth in Lending*, 74 Fed. Reg. 5244, 5281 (Jan. 29, 2009); *Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 58 Fed. Reg. 46,551, 46,554 (Sept. 2, 1993).

My colleagues object that the record lacks "any comparative analysis." *Ante* at 11. But MSHA did compare the competing safety considerations. It concluded that the amended recording rule would produce "as much or more in safety benefits" by heightening incentives to correct hazards promptly, and that decluttering examination records would provide further safety benefits. *Mine Examinations II*, 83 Fed. Reg. at 15,059. My colleagues respond that MSHA's safety assessment was too "conclusory." *Ante* at 12. *National Mining* indicates otherwise. There, we upheld various amendments to mine-safety regulations challenged as inconsistent with the no-

4

less-protection rule. In four instances, MSHA's explanation was not materially different from the one at issue here.

*First*, we upheld an amendment permitting the use of electricity for vehicles to evacuate miners if a ventilation fan shuts down. Commenters objected that electricity would be dangerous in that circumstance, but MSHA asserted without elaboration that the amendment would facilitate evacuations. *See Safety Standards for Underground Coal Mine Ventilation*, 61 Fed. Reg. 9764, 9772 (Mar. 11, 1996) (*Ventilation Standards*). We accepted the assertion and thought ourselves "required to defer to the agency." 116 F.3d at 537. We explained: "In this case, the agency has determined that the safety benefit gained by rapid evacuation of miners outweighs the risk of ignition. We are poorly positioned to second-guess the agency on the balancing of these two concerns." *Id.*

*Second*, we upheld an amendment limiting pre-shift inspections to violations of rules presenting an immediate hazard to miners. MSHA asserted that narrowing the inspections would improve safety, because "look[ing] for violations that might become a hazard could distract examiners from their primary duties." *Ventilation Standards*, 61 Fed. Reg. at 9793. We accepted the explanation without plumbing the record for more. 116 F.3d at 540.

*Third*, we upheld an amendment permitting less frequent inspection of fans that use an automated monitoring system. MSHA asserted that the improved technology would "provide greater safety" on balance. *Safety Standards for Underground Coal Mine Ventilation*, 57 Fed. Reg. 20,868, 20,874 (May 15, 1992). Our response: "Where an evaluation is to be made of the net safety effects of a change in a regulation, the court properly defers to [MSHA's] evaluation." 116 F.3d at 542.

*Fourth*, we upheld an amendment that narrowed another inspection recording rule to exclude defects "corrected by the end of th[e] shift." 30 C.F.R. § 75.312(g)(1). Commenters objected that the amendment would reduce safety by eliminating information about "recurring problems that may lead to bigger problems." *Ventilation Standards*, 61 Fed. Reg. at 9772. MSHA disagreed and asserted that "no safety purpose is served by requiring examiners to record problems" that had been promptly corrected. *Id.* We upheld the amendment, once again based on "our deference to [MSHA's] determination of net effects." 116 F.3d at 543.

Given these holdings, we should accept MSHA's explanation in this case. The agency correctly understood the governing legal question—whether the amendment reduced health or safety protections for miners. It identified considerations reasonably bearing on that question. And it compared the competing considerations to make an explicit assessment of the "net safety effects of a change in a regulation." 116 F.3d at 542. As *National Mining* recognized, we are "poorly positioned to second-guess the agency on the balancing" of the relevant safety risks and benefits. *Id.* at 537.

My colleagues object that the petitioners in *National Mining* did not challenge "the adequacy of MSHA's explanation," but only the "*factual determinations* that the new standard provided miners with as much protection as the old standard." *Ante* at 12. Our opinion did not suggest that distinction. Rather, it was framed as a review of MSHA's explanations: we held that MSHA must "state the basis for its conclusion that the [no-less-protection] rule has been satisfied;" then, we found "[i]n each case … no grounds to conclude that the Secretary failed to engage in reasoned decisionmaking." 116 F.3d at 536. Moreover, there was no reason to distinguish between MSHA's explanation and its

factfinding. For each challenged regulation, the agency identified safety benefits to the amended rule, acknowledged countervailing costs, and concluded that the benefits outweighed the costs. Those "factual determinations," as my colleagues describe them, *were* the agency's explanation of why each proposed amendment was consistent with the no-less-protection rule. And as shown above, they were neither different in kind from, nor more fully developed than, the determination made here by MSHA.

My colleagues further contend that MSHA failed to address "its own previous findings" regarding the 2017 recording rule. *Ante* at 13. But MSHA did address its key prior finding. In 2017, MSHA concluded that "recording all adverse conditions, even those that are corrected immediately, will be useful as a means of identifying trends." *Mine Examinations I*, 82 Fed. Reg. at 7686. In assessing the 2018 amendment, MSHA recognized that benefit of the 2017 rule, but concluded that two competing safety considerations outweighed it. *Mine Examinations II*, 83 Fed. Reg. at 15,059. In that respect, the two analyses are consistent. In 2017, MSHA further stated: "a record that notes the adverse conditions prior to miners working in an area expedites the correction of these conditions notwithstanding the regularity in which the adverse conditions occur." *Mine Examinations I*, 82 Fed. Reg. at 7686. That statement addressed a suggestion to exclude from the recording requirement uncorrected hazards that were "regularly recurring." *See id.* In 2018, no further comment on this point was necessary, as there was no proposal to revisit the issue. In 2017, one commenter argued that excluding "immediately corrected" hazards from the recording requirement "would provide an incentive to immediately correct" them. *Id.* But MSHA did not respond to this point, let alone compare the safety benefits of that proposal to those of the rule adopted. *See id.* Nor did MSHA need to make such a comparison—between

the 2017 rule and its eventual 2018 successor—in order to conclude that the 2017 rule was safer than its 1979 predecessor.

As for the two safety benefits noted by MSHA in 2018, my colleagues question whether the 2018 rule will incentivize mine operators to correct adverse conditions promptly, because other regulations already require them to do so. *Ante* at 10. But there is nothing unreasonable about providing increased incentives for compliance, by reducing the recording obligations of operators who do comply.

Finally, my colleagues conclude that "the risk of inundating miners with information" does not "appear in the administrative record." *Ante* at 11 n.3 (quotation marks omitted). I read the record differently. As MSHA recounted, some commenters warned that "requiring all adverse conditions [to] be recorded in the examination record would overwhelm the record with minor housekeeping issues." *Mine Examinations II*, 83 Fed. Reg. at 15,059. MSHA "agree[d] with these commenters and conclude[d] that requiring mine operators to record only those adverse conditions that are not corrected promptly is as protective as the January 2017 rule." *Id.* Moreover, the commenters' concern was a safety one. They explained that a cluttered record risked "'alarm fatigue,' whereby too many warnings become background noise and no one really hears them." J.A. 911; *see also* J.A. 769. MSHA reasonably credited that concern here—just as, in *National Mining*, it reasonably credited the concern that an examination record filled with corrected hazards might "distract [mine operators] from the primary focus" of identifying ongoing safety risks. 116 F.3d at 539.

My colleagues note that MSHA adopted the relevant comments "in a paragraph regarding mine *operator* burdens." *Ante* at 11 n.3. But the surrounding discussion does not change

the fact that MSHA agreed with commenters who expressed concern that cluttering the examination record would harm miner safety. Moreover, MSHA adopted these comments to make a clear safety determination: "requiring mine operators to record only those adverse conditions that are not corrected promptly is as protective as the January 2017 rule." *Mine Examinations II*, 83 Fed. Reg. at 15,059. Under these circumstances, "the agency's path may reasonably be discerned," so we must "uphold the decision even if it is of less than ideal clarity." *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1122 (D.C. Cir. 2017) (quotation marks omitted).

In sum, I believe that MSHA adequately explained why the 2018 amendment to the recording regulation is consistent with the no-less-protection rule. Because my colleagues conclude otherwise, I respectfully dissent from Part II.B of the Court's opinion.